Benjamin Brenner, J.
The relator is a patient in a State mental hospital who, by means of this habeas corpus proceeding is seeking his release. The respondent hospital claims that he has not sufficiently recovered to permit such release. They also refuse to apply the provisions for periodic court authorization for retention of patients in mental hospitals as set out in subdivision 3 of section 73 of the Mental Hygiene Law, as amended, effective September 1, 1965, claiming that the provisions of the construction clause contained in section 217 of the Mental Hygiene Law, as amended, expressly exclude those persons certified before September 1, 1965 from the protective procedures of subdivision 3 of section 73. The pertinent clause of section 217 states as follows: “As to any persons admitted to be certified pursuant to the provisions of this chapter prior to its amendment by this act, the provisions of this chapter prior to such amendment shall continue to govern.” (Emphasis supplied.)
It is my considered view that the hospital authorities are misconstruing the clause. I also believe that the newly enacted amendment of the Mental Hygiene Law (L. 1964, ch. 738, off. Sept. 1,1965) sets up arbitrary and unreasonable classifications which cancel out important and salutary benefits also therein provided for admission and retention procedures.
It surely was the hope and expectation of those who sought to ameliorate admission and retention conditions of the mentally ill and the senile aged, in regard to speedy and efficacious treatment and to protection of their civil liberties, that all persons alleged to be mentally ill shall enjoy equal benefits, treatment and status. Unfortunately, this is impossible if court-authorized retention will not be pursued for the bulk of presently hospitalized patients, who have been admitted before September 1, 1965, and if the arbitrary classification of “ voluntary ” patient may continue to be induced and secured.
*59 First, as to construction, the above-quoted language of the amended act was obviously intended to apply to interim admission procedures and was designed to cover those who were “ admitted to be certified ” under the provisions of the act prior to its amendment. If the Legislature had intended to exclude persons already certified from the benefits of the act, it could easily have used the words “ already certified,” which would have clearly shown that it did not intend any part of the new provisions to have any retroactive effect. By using the words “ admitted to be certified ” it seems clear that the reference was to persons as to whom the initial certification procedure had begun but would not be completed before September 1,1965. As to such persons, the laws under which the initial certification procedures have begun would continue. It does not thereby exclude from its coverage the vastly improved right to automatic and periodic court-authorized retention procedures which right has been acquired by all mentally ill patients who have been hospitalized before and since September 1, 1965.
Under the provisions of section 73 of the amended act, a mandatory procedure for court authorization to retain an involuntary patient has been set out which protects him against long-term unauthorized detention. Hospitalization is continued for the first 60 days where no hearing is requested, but court authorization is required thereafter, and court reauthorization for retention is repeatedly mandated after successive periods of six months, one year, and two years, unless the patient agrees to become a “ voluntary ” patient. There are also requirements for notices to the patient, his relatives, and to the Mental Health Information Service, following the procedure set out in the original admission, and, unless the patient agrees to remain, he cannot be compelled to do so without these periodic court authorizations.
The right to possible release and the right to court hearing and surveillance with respect to continued long-term hospitalization cannot be reserved merely for the handful of the newer patients and denied to the thousands of patients who are so unfortunate as to have been admitted prior to September 1,1965. If those patients are to be excluded and relegated to the discredited procedures of the pre-amended statute, there would remain for them the possibility of perpetual and unending forced incarceration in the mental hospitals unless, in the judgment only of hospital doctors, they should be found to have become well, or in the rare case such as this, a writ of habeas corpus is sought. (Upon the hearing herein the court was *60 informed that only a single application for an order of retention, of the several thousand patients at Brooklyn State Hospital, has been made since September 1,1965, the effective date of the act.)
The petitioner is a drug addict and is one of such earlier patients. His exclusion is not based upon any differentiation as to the nature or degree of his mental illness and physical condition. The sole reason ascribed for construing the clause against him is that he was admitted prior to September 1, 1965. That construction, which so cruelly bars him from the self-.executing and periodic court-authorized retention procedures is not in the public interest. It is contrary to the obvious purpose of the Legislature to substitute for a palpably unsalutary retention practice, a humane procedure consistent with civil liberty.
Suppose the Legislature were to enact a statute which provides ameliorating or improved parole conditions to convicted persons. Would not a clause in such a statute, construed in such way as to deny the improved parole conditions to persons convicted after its amendment, defeat the legislative purpose to benefit all parolees!
We must look to the rules of statutory construction as to legislative intent. The general rule is that statutes are to bo construed as prospective only unless a clear expression of contrary intent is found (Matter of Mulligan v. Murphy, 14 N Y 2d 223; Matter of Ayman v. Teachers’ Retirement Bd. of City of N. Y., 9 N Y 2d 119; People v. Oliver, 1 N Y 2d 152; Shielcrawt v. Moffett, 294 N. Y. 180; Jacobus v. Colgate, 217 N. Y. 235).
There is one important exception to this general rule, however, and that is in the case of remedial statutes designed to correct imperfections in a prior law. Such statutes are to be liberally construed so as to spread their beneficial result as widely as possible and wherever possible are to be given a retroactive effect (Shielcrawt v. Moffett, supra; Laird v. Carton, 196 N. Y. 169; Lazarus v. Metropolitan El. Ry. Co., 145 N. Y. 581; Matter of Robinson [Catherwood], 11 A D 2d 374; People ex rel. Gabriel v. Warden of New York County Penitentiary, 109 Misc. 248; McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 54).
The case of People v. Warden of New York County Penitentiary (supra) presents some similarities to the present situation. There the court was construing a statute which amended the Penal Law and provided that time served prior to conviction and before sentence should be counted as part of the term of the sentence imposed. The petitioner had been convicted and sentenced prior to the enactment of this statute and the time *61 which he had served prior to his sentence taken together with the time he had served after sentencing would have completed the sentence, and he was asking the court to apply the statute retroactively. The court held that the statute did not by its express terms have a retroactive effect, but that since it did not by express words forbid such retroactive effect, the statute being a beneficent one, would be liberally construed and applied retroactively.
The need for retroactivity to assure equality of treatment is not lessened simply because civil rights previously denied are asserted in a statute. Surely if perpetual legal detention of mental patients, without court authorization, as prevailed previously under the old statute, constituted an affront to their civil liberties, the correction of the evil should apply to all, and not solely to the recently admitted patients. Since this is a remedial and beneficent statute, the rules above discussed require that the provisions of subdivision 3 of section 73 of the Mental Hygiene Law should be applied to all persons now confined to mental hospitals.
There is, as above indicated, yet another hazard facing petitioner. He may at any time be induced to remain in the hospital as a “ voluntary ” patient for, under subdivision 5 of section 71, the patient’s hospitalization may not only be converted to “voluntary” on his admission but the conversion may also take place thereafter. Moreover, the statute sets out a policy of encouragement for such conversion. Thus subdivision 5 of section 71 of the amended act provides: “ It shall be the duty of all state and local officers having duties to perform relating to the mentally ill to encourage any such person suitable therefor and in need of hospitalization therefor to apply for admission as provided in the section. Nothing contained in this article shall be construed to prohibit any director from converting, and it shall be his duty to convert, the admission pursuant to any other section of this article, of any patient suitable and willing to apply therefor, to admission pursuant to this section. No requirement shall be made, by rule, regulation or otherwise as a condition to admission and retention pursuant to this section that any person applying for admission shall have the legal capacity to contract.”
Now, upon such conversion to voluntary status, either on admission or thereafter under subdivision 5 of section 71, the patient has few of the protective rights provided for involuntary patients in sections 72 and 73. Notices, preparatory to court hearing, to him, to his designees, and to the Information Service, which is an arm of the court, are not available as they are to an *62 involuntary patient. Under the voluntary classification he cannot as readily rely on others, including the Information Service, to initiate or request a hearing before the court in a designated county or for a court-ordered transfer of custody to relatives and others if he be found mentally ill but harmless.
Most important, retention of involuntary patients can only be on court authorization. No so for the voluntary patient, who must possess the understanding and mental capacity to make the initial request for a court-authorized retention, and it can be had only on notice in writing from the patient should he possess the courage and judgment to request release from the hospital. Though a voluntary patient has the dubious privilege of being informed of his voluntary status and to avail himself of the Mental Health Information Service, it is questionable that he will appreciate the privilege. So, since officials are commanded to induce the voluntary status, which will shortly apply to the bulk of patients in the mental hospitals, these unfortunate and helpless people are virtually in no position to gain their release unless they are in possession of the knowledge and stamina needed to initiate the proceeding to accomplish it.
It is also important to consider whether the mentally ill may legally be regarded as having the capacity to understand the requirement for or the significance of their right to object to the authorized pressures referred to which relegate them to the voluntary status and the imposition of conditions for release substantially less liberal than those accorded to patients capable of resisting the urgings of the hospital authorities for conversion to voluntary status. A person who is alleged to be mentally ill and who meekly submits to the authorized pressure for voluntary status or is unaware of his right to resist that pressure deserves, even the more, the protective arms of the law. At the very least he is entitled to the presumption that he is unable to exercise the judgment or the mental capacity to understand his legal right to decline the voluntary status and thus preserve his right to court-ordered retention.
The situation is even worse in the case of aged seniles without major mental impairment, almost 100% of whom are in the voluntary classification. Their enforced retention remains the same as that which prevailed under the former practice. It may therefore be useful to repeat my remarks as to them, made in 1958: “ Moreover, the denial of judicial hearing or sanction is * * * grounded on a fictitious consent given by one who concededly is confused and disoriented. Even if positive objection is not required by the Mental Hygiene Department, the consent thus extracted is dubious because the senile is not likely *63 to understand that the admitting institution is a mental institution, even if he be told that it is. Often he is chagrined and humiliated following family rejection and has neither the will nor the capacity to object even if he be carefully advised. That he is aware of his right to object or of the significance of his failure to object is doubtful. In short, the pinlc sheet procedure [referring to the form used until recently for admissions under section 73], in my view, is little less than a ruse designed to circumvent the need for judicial consideration or review of the transfer of the senile to a mental institution. Thus unknowingly certified, without opportunity to secure private custodial care, we have assembly line incarceration, depriving the aged of their liberty of person and, as was said by Judge Gabbity (Matter of Neisloss, 8 Misc 2d 912, 913): ‘ No matter how sweetly disguised or delicate the language, involuntary confinement is a loss of freedom.’ ” (Matter of “Jones ”, 9 Misc 2d 1084,1085-1086).
Significantly, subdivision 5 of section 70 declares it to be the legislative intent to deprive no person of civil rights: “ Notwithstanding any other provision of law to the contrary no person admitted to a hospital by voluntary or informal admission shall be deprived of any civil right solely by reason of such admission nor shall such admission modify or vary any civil right of any such person ”. Despite this clear intent to preserve civil rights, subdivision 5 of section 71, goes on to state it to be the legislative intent not to require, as a condition to voluntary admission and retention, that the consent shall be based on the legal capacity to contract. This assumes that though a mentally ill patient may lack legal capacity to contract, he nevertheless has the legal capacity to agree to deprive himself, by agreement with the hospital authorities, of the rights which are accorded to “ involuntary ” patients.
It is, of course, familiar law that mental incapacity, whether there be a judicial declaration of insanity or not, will void a contract for lack of consent. But in eases other than those involving contract, the act of one mentally ill may also be dis-affirmed, i.e., an act of retirement from the public school system while mentally incompetent (Martin v. Teachers’ Retirement Bd. of City of N. Y., 70 N. Y. S. 2d 593); a wife’s act of abandonment of the husband (Sengstack v. Sengstack, 4 N Y 2d 502); an attempted marriage by one mentally incapacitated (Hoadley v. Hoadley, 244 N. Y. 424).
Certainly, the acts of the mentally ill and the aged senile who accommodate themselves to the pressures of the hospital officials for acceptance of voluntary status and who are either *64 unknowing, meek or co-operative, ought not thereby to be induced to forego rights accorded to those less amenable to co-operation. What is more, since a person admitted and detained as mentally ill is unable to make sound judgments, the law should be especially solicitous for his welfare and not, as here, encourage its' officials to induce or beguile such a patient, in the midst of his confusion and agony, to make judgments of doubtful integrity. The case would be the same if a newly enacted statute were to grant immunity to all witnesses in a criminal trial who involuntarily testify against an accomplice but deny immunity to those who voluntarily do so and, by the language of the same statute, a Trial Judge were to be enjoined to induce witnesses to testify voluntarily so that they be denied immunity.
As has been demonstrated, the provisions for arbitrary and unreasonable “voluntary” classification, as set up in the act, is directly contrary to the whole purpose and spirit of the ameliorating provisions for admission certification and retention procedures. Such classification denies both due process and equal protection and is therefore of doubtful constitutionality. The requirement that hospital officials shall encourage and induce patients to accept that unjust classification is most unworthy. Both the classification and the requirement that it be encouraged should be entirely eliminated.
Certainly the new procedure under the Mental Hygiene Law for continued retention of a mentally ill person is a remedial statute and designed to have a beneficent effect on those mentally ill persons who, under the previous law, were shut up and the key virtually thrown away. This view of the statute as remedial is borne out by the Governor’s statement upon signing this law, to the effect that it “preserves due process safeguards of every person who is admitted to a psychiatric facility for care and treatment” (McKinney’s Session Laws of New York, 1964, p. 1968; italics added). This message, to me, means that each person, whether mentally ill or merely alleged to be so, whether he be a psychotic senile or one who has no real major mental impairment, whether he be admitted before or after September 1, 1965, and whether he is classified as a voluntary or an involuntary patient, must nonetheless be counted as a human being. It means that when a dreadful illness affecting the brain has touched such a human being, he is not only entitled to the prompt visitation and examination of a medical doctor but to the tender solicitation of the law as well. It means that the newly established Mental Health Information Service, created as the law’s watchdog, should become involved not merely with some patients but with each and every patient, *65 so that if an error has been made about the diagnosis, if mischief was perpetrated in the very allegation of mental illness, if there is an unnoticed recovery, if there is a possibility that the patient may be discharged as mentally ill but harmless — in short, if relief from forced or unwanted detention is justified, then the sacred right to freedom of person must be preserved.
In the meantime and at the very least the most liberal interpretation and application of the statute should be utilized as to its existing provisions. Thus, all references to voluntary patients set out in section 71 and elsewhere in the Mental Hygiene Law, as amended, must be liberally construed to accord to voluntary patients the full safeguards of court surveillance with respect to notices and desire for court hearings or court-authorized retention. Fortunately, the Presiding Justice of this Department has wisely promulgated a rule that the Director of the Mental Health Information Service shall assure, among other things, the compliance with the prescribed procedures as to retention, which rule applies to all patients, whether they be voluntary or involuntary patients. Rule II, in part, reads as follows: “3. The Director of the Service shall ascertain that the notices required under the provisions of Article 5 of the Mental Hygiene Law to be given to patients, and to other persons entitled thereto, have been duly served and that there has been due compliance with the procedures prescribed by said Article 5 of the Mental Hygiene Law in connection with the hospitalization, transfer, retention or release of patients.”
The writ is accordingly sustained, but since the present continued mentally ill condition of the relator has been established he is remanded to the custody of the respondent hospital which is hereby directed to forthwith apply to the court for an order pursuant to subdivision 3 of section 73 of article 5 of the Mental Hygiene Law authorizing continued retention of the relator for a period of six months.
The respondent is further directed to apply for an order of retention pursuant to said section as to all involuntary patients admitted prior to September 1, 1965, and the Director of the Mental Health Information Service is directed to ascertain and make a written report as to notices to and the expressed wish of all voluntary patients for court hearings and orders relative to their retention.
The Attorney-G-eneral is directed to submit a judgment in conformity -with this decision and to serve notice of entry thereof to the applicant, the respondent, and the Director of the Mental Health Information Service.