In the Matter of JOSEPHINE BUTTONOW, an Incompetent Person.

Supreme Court, Special Term, Queens County, December 30, 1966.

*Seymour Kagan,* committee in person. *Louis J. Lefkowitz, Attorney-General (Marie A. Beary* of counsel), for Central Islip State Hospital. *Martin Siegelbaum* for Mental Health Information Service, Second Judicial Department.

JOSEPH M. CONROY, J. This is a special proceeding by the committee, appearing *pro se,* for a judgment declaring void and setting aside a conversion of his ward's status at Central Islip State Hospital from that of an " involuntary " patient to that of a " voluntary " patient, and for other and further relief under article 4 of the CPLR.

The incompetent has been a patient and resident at the hospital continuously since September 9, 1961, having been admitted pursuant to an order of certification of the County Court, Suffolk County.

The committee alleges that on July 30, 1964, the Supreme Court granted a judgment in favor of the incompetent's husband, annulling his marriage to the incompetent upon findings that she had been incurably insane for a period of over five years; and that as late as August 6, 1966, the hospital had informed the committee that there had been no change in her mental condition. The committee asserts that despite this judgment and the subsequent communication, the hospital authorities, on October 20, 1966, without notice to himself and without his knowledge and

consent, permitted the incompetent to sign an application and agreement to remain in the hospital as a " voluntary " patient.

He further asserts that his ward, as an adjudicated incompetent person, had no power at law to enter into the agreement; that the declaration of incompetency is notice to the world of her incapacity, binds everyone who deals with her, and that the agreement would be void even if at the time of signing she had full possession of her mental faculties.

The Attorney-General of the State of New York, appearing in behalf of Central Islip State Hospital, contends that none of the reasons set forth by the committee can be a basis for setting aside the action of the doctors at the hospital, and argues further that subdivision 5 of section 71 of the Mental Hygiene Law provides: " No requirement shall be made, by rule, regulation or otherwise as a condition to admission and retention pursuant to this section that any person applying for admission shall have the legal capacity to contract." He also urges that there is no duty on the hospital to consult with the committee with respect to the change of hospital status of a patient; that the Legislature intended that every effort *must* be made to convert a patient to a voluntary basis; that the hospital was merely carrying out its duty under the law as passed by the Legislature, and that whether or not a patient is " suitable " to convert to a voluntary status is strictly a *medical* matter to be determined by the Director and the doctors and not by the court.

The committee, in response in open court, concedes that the actions of the hospital authorities and doctors comply with the provisions and mandate of article 5 of the Mental Hygiene Law, as enacted by the Legislature, but asserts, in effect, that the entire statutory scheme or plan of dividing the mentally ill into classes — " Voluntary " and " Involuntary " — with rights, remedies and privileges conferred upon one class and withheld from the others, does violence to the fundamental concepts of justice and the guarantees of due process and equal protection of the law, as the classification is arbitrary, capricious and unreasonable.

The Attorney-General contends that the court may not review, in this manner, the hospital's action — a matter of internal procedure and management on the part of the Director and his doctors — and that the committee's remedy is to apply to the Commissioner of Mental Health, under section 86 of the Mental Hygiene Law to rectify, and, therefore, this court has no jurisdiction in this matter.

This contention is without merit. This court has full and complete jurisdiction over the property and the person of its ward,

and certainly this conversion involves the "person" if not the property of the incompetent.

Article 5 of the Mental Hygiene Law describes three types of admission to mental institutions. There is an "informal" admission, under which a patient may be admitted without making a formal, written application, and is, theoretically, free to leave the hospital at any time. Secondly, there is an "involuntary" admission based upon (a) a certificate of the County Commissioner of Health or other designated official; (b) a certificate of two physicians; (c) a certificate of one physician, where the patient does not object and (d) an order by a Magistrate or Peace Officer or upon similar process. Thirdly, there is the "voluntary" admission where a formal, written application is made by the patient, and where the Director of the hospital may detain the patient for a period not exceeding 15 days for care and treatment, and thereafter until 10 days after receipt of a notice in writing of the patient's intention or desire to leave the hospital. Again, theoretically, this notice must be honored and the patient released. However, it should be noted at this point that subdivision 3 of section 71 provides: "If it be determined that any such patient does not belong to the voluntary or informal class the department shall determine whether the patient shall be discharged or *whether procedures shall be commenced for the admission of such patient to a hospital pursuant to other sections of this article.*" (Emphasis supplied.)

General Order No. 2 of the Department of Mental Hygiene contains the following directive as to a "voluntary" patient giving notice of desire to leave the hospital: "If the patient's condition at the time he presents his notice to leave the hospital is such that he does not appreciate his mental condition, and he is considered to be dangerous to himself or others, a Two Physician Certificate admission should be arranged."

Thus it is readily apparent that one admitted as a voluntary or an informal patient has no assurance that he will be released on 10 days' notice or on demand, despite any belief he may have as to his right to be so released.

Justice BENJAMIN BRENNER in *People ex rel. Kaminstein* v. *Brooklyn State Hosp.* (49 Misc 2d 57) has ably and in a most scholarly manner analyzed the rights and privileges of involuntary and voluntary patients. Briefly, the "involuntary" patient is subject to periodic court review as to his retention since he may not be held for more than 60 days without court order or authority for his continued retention. He has a right to a review of such order and a right to a trial by jury as to his mental illness (Mental Hygiene Law, § 74). At times thereafter

— six month, one year and then at further two year intervals — application must be made by the Director for continued retention. Notice of such application must be given to the Mental Health Information Service, an arm of the Appellate Division of this court and an able and alert guardian and protector of the rights of the mentally ill.

A '' voluntary '' patient — on the other hand — has the again theoretical right to leave the institution on 10 days' notice in writing. It is required that he be informed once during each 120 days of his status and rights as a voluntary patient, including his right to avail himself of the facilities of the Mental Health Information Service, which may intervene only at the request of the patient or some one in his behalf.

The Attorney-General feels that the patient has gained by the action of the hospital, and that she now has the right to request her release which would have to be honored unless the hospital considered it contrary to her welfare, in which case it could seek an order of retention for a period not to exceed six months. This contention may have merit were it not for the fact that in all these matters we are involved with persons who, to a greater or lesser degree, are admittedly mentally ill, and may lack the simple understanding needed to be aware of what they are signing.

While the law clearly states that legal capacity to contract is not required, it is equally clear that the patient must be '' suitable and willing ''. No guidelines are indicated or established to assist in determining *who is suitable and willing.* In every-day common sense usage, '' willingness '' requires at least possession of that simple understanding. Are these vital determinations, as to which patients are suitable and willing, to be left solely and completely in the hands of the Directors and their staffs, without judicial review?

The often expressed and stated theory and purport of the proponents of voluntary admissions is the conversion of the great bulk of patients to that status. Statistics supplied to the court by the Mental Health Information Service reveal that at one institution, Creedmoor State Hospital, out of 3,118 patients in residence under the so-called '' new '' forms, 2,676 (approximately 85%) have '' voluntary '' status. With the passage of not too much time, well over 80% of all the hospital population will be removed from the protection of judicial review, as well as from the protection afforded by the Mental Health Information Service. A substantial percentage of these people are senile persons who may be expected to deteriorate over their remaining years; they may never have or regain sufficient mental capacity

or understanding to request a release. Those not in the senile class may deteriorate or they may improve, but not to an extent sufficient to enable them to appreciate or to exercise their rights; they may be fearful of doing so; they may wish to avoid confrontation with or antagonization of anyone in authority. They may remain forever incarcerated and so become "lost" patients, bereft of friend and protector.

Concern over the rights of voluntary patients was expressed by the Special Committee to Study Commitment Procedures of the Association of the Bar of the City of New York, in co-operation with the Cornell Law School, in its volume entitled "Mental Illness and Due Process, Report and Recommendations on Admission to Mental Hospitals under New York Law" (1962) at page 54: "*Recommendation No. 10 (Information to Voluntary Patients)*. It shall be the duty of a state hospital or licensed private institution to inform the voluntary patient in writing at the time of his admission, and thereafter before the expiration of sixty days, thereafter before the expiration of one year, and thereafter before the expiration of each two-year period, of his status as a voluntary patient. The Mental Health Review Service shall explain to the patient at the time of his admission, and at each of these other times, the conditions of his hospitalization and his rights as a voluntary patient."

The committee thus saw fit to recommend the intervention of the Mental Health Information Service at the time of admission and periodically thereafter. However, this recommendation was not adopted by the Legislature.

Section 71 of the Mental Hygiene Law thus in effect has established an underprivileged class of patient with a *theoretical* right to release on 10 days' notice — a right which the Attorney-General states would be honored only if the authorities did not consider it contrary to the patient's welfare — but without the protection of the law afforded to involuntary patients. It denies those who are most in need and deserve it both due process and equal protection of the law.

In the absence of periodic judicial review of retention of "voluntary" patients, and in the absence of compulsory involvement of the Mental Health Information Service for "voluntary" patients, I hold section 71 of the Mental Hygiene Law to be in violation of the Constitutions of the State of New York and of the United States.

The court finds the attempted conversion of the incompetent's status to that of a "voluntary" patient to be a nullity, and the petition is granted.