Chief Judge Fuld.
Josephine Buttonow, an adjudicated incompetent, 39 years old, was admitted to Central Islip State Hospital as an involuntary patient, under an order of certification of the County Court of Suffolk County in 1961. Five years \ later, in October of 1966, following an interview and examination by a supervising psychiatrist at the hospital, Mrs. Buttonow filed a “ voluntary application to remain in the hospital ”, thereby *388 converting her status from an involuntary to a voluntary patient, pursuant to recent amendments of section 71 of the Mental Hygiene Law.
Her committee, who received notice of such action after the event, brought this special proceeding against the director of the hospital (the appellant herein) for a declaration that the change of her status was ‘ ‘ null and void ’ ’. According to the petitioner, such conversion deprived the incompetent of certain ' ‘ legal protections ” accorded involuntary patients and she was thereby denied due process and equal protection of the law. The Attorney-General, who represents the hospital’s director, in addition to maintaining that the incompetent suffered no violation of constitutional or other rights, argues that the New York Supreme Court lacks jurisdiction of a proceeding such as this.
The court at Special Term granted the committee’s petition, holding section 71 of the Mental Hygiene Law unconstitutional because of the “ absence of periodic judicial review of retention of ‘ voluntary ’ patients ’ ’ and the ‘ ‘ absence of compulsory involvement of the Mental Health Information Service for ‘ voluntary ’ patients ”. The Appellate Division, in affirming, did not reach any constitutional questions; instead, it simply declared that an adjudicated incompetent “ does not have the legal capacity to request, consent or agree to the conversion of his status from that of an ‘ involuntary ’ admission to that of a ‘ voluntary ’ admission.” The appeal is before us by our leave.
Before considering the merits, we address ourselves briefly to the Attorney-General’s contention that the Supreme Court did not have jurisdiction of the present proceeding. Section 100 of the Mental Hygiene Law expressly declares that that court has ‘1 jurisdiction over the custody of a person and his property if he is incompetent to manage himself or his affairs by reason of * * * mental illness ”—which, it is hardly necessary to say, includes jurisdiction over his continued retention. It follows, therefore, that the courts below very properly entertained jurisdiction of the proceeding initiated by petitioner committee for relief.[1]
*389 Although patients had been admitted to hospitals for the mentally ill on a voluntary basis long before the enactment in 1964 of new article 5 of the Mental Hygiene Law, that statute now provides, in addition, for the transfer of involuntary patients to a voluntary status. Subdivision 5 of section 71 declares that “ Nothing contained in this article shall be construed to prohibit any director from converting, and it shall be his duty to convert, the admission pursuant to any other section of this article [i.e., j involuntary], of any patient suitable and willing to apply there- ! for, to admission pursuant to this section [i.e., voluntary or informal].”[2] Persons applying for voluntary admission, the statute further recites, are not required to “ have the legal capacity to contract ” (subd. 5).
Voluntary patients must be advised of their status and their rights upon admission and “ once during each one hundred twenty days of hospitalization * * * including their right to avail themselves of the facilities of the mental health information service ’ ’ (subd. 4) .[3] The Mental Health Information Service — established pursuant to section 88 in each judicial department of the Supreme Court —in addition to reviewing the admission and retention of involuntary patients and providing them with relevant information is called upon to perform similar services for \\ voluntary patients “ as may be requested ” by the latter or anyone on their behalf.
It is somewhat anomalous that the incompetent’s committee — who is in a position to see that her interests as a voluntary patient are protected—should not wish her to receive the advantages of voluntary admission. The beneficial effects of such status have been widely heralded in the treatment of the mentally ill. *390 A law review commentator points out that “ [i]t is universally acknowledged that, both medically and legally, voluntary admission offers the most desirable procedure for the hospitalization of the mentally ill. Since [a voluntary] patient * * * presumably recognizes the need for medical attention, he is likely to participate actively in his course of treatment; such participation greatly increases the chances of success of psychotherapy. Moreover, where voluntary hospitalization is readily available, treatment is apt to commence at an early stage of the illness, when there is a relatively strong likelihood of complete recovery.” (Note: District of Columbia Hospitalization of the Mentally Ill Act, 65 Col. L. Rev. 1062.)
It is true, as noted in Judge Breitel’s opinion (pp. 396, 398), that advice and help of the Mental Health Information Service is available to a voluntary patient. However, it is exceedingly significant that, if the statute be read as he suggests, the request for such counsel and aid, indeed for release from the hospital as well, must be initiated by the patient himself. In other words, the protection afforded the patient by the availability of assistance from the Mental Health Information Service is seriously limited by the fact that, unless the patient affirmatively takes the initial step, the likelihood is that only the hospital staff will have any say with respect to his release or his continued retention.
In sharp contrast is the protective shield of checks and balances placed around the involuntary patient. For instance, his detention is subject to court review at the end of the first six-month period, again at the end of one year and thereafter at two-year intervals (§ 73),[4] and he or a relative or friend who is dissatisfied with his retention may obtain a jury trial on the issue of his sanity (§ 74). In addition, as indicated above, the Mental Health Information Service, which performs services for the voluntary patient only upon his request, must be notified of an involuntary patient’s admission and is charged with a duty to “ study and review ’ ’ his admission and retention and provide him and other interested parties with advice and relevant information (§ 88).
*391 Were the incompetent before ns to be deprived of these protections by her transfer from involuntary to voluntary admission, grave doubt of the constitutionality of her conversion under section 71 would arise. (See, e.g., People ex rel. Kaminstein v. Brooklyn State Hosp., 49 Misc 2d 57, revd. on other grounds 26 A D 2d 669; see, also, Note, 67 Col. L. Rev. 672.) Some of the dangers of such transfer are adverted to in the Kaminstein case where Justice Brenner wrote (49 Misc 2d, at pp. 63-64):
‘ ‘ Certainly, the acts of the mentally ill and the aged senile who accommodate themselves to the pressures of the hospital officials for acceptance of voluntary status and who are either unknowing, meek or co-operative, / ought not thereby to be induced to forego rights accorded to those less amenable to co-operation. What is more, since a person admitted and detained as men- \ tally ill is unable to make sound judgments, the law should be especially solicitous for his welfare and not, as here, encourage its officials to induce or beguile such a patient, in the midst of his confusion and agony, to make judgments of doubtful integrity.”
With respect to the provision that consent need not be based upon the legal capacity to contract, the court in Kaminstein added that “ [t]his assumes that though a mentally ill patient may lack legal capacity to contract, he nevertheless has the legal capacity to agree to deprive himself, by agreement with the hospital authorities, of the rights which are accorded to ‘ involuntary ’ patients ” (p. 63).
Concerning the Kaminstein decision, the author of a note on the New York Mental Health Information Service has written (67 Col. L. Rev. 672, 696): “ In light of the hazy statutory criteria [in § 71] defining potential voluntary patients, this judicial concern is warranted. Each patient signs an acknowledgment to the effect that he understands his rights, but the statute does not specify the mental capacity required of the signer. It dictates merely that the patient be suitable for care and treatment and , willing to undergo treatment, and specifically states that he need \ not have legal capacity to contract at the time that he signs; If the patient cannot understand written notice of his rights, ( and no one else is. informed of his incarceration, the right to *392 release becomes chimerical. In such circumstances, the 1 voluntary ’ patient is deprived, of his liberty, yet review is left to the very people who are detaining him —the hospital staff.”
The operative statute with which we are concerned recognizes the right of a mentally ill person to restrictions on the medical review of his detention. For instance, subdivision 3 of Section 70, which deals with admission procedures and other general requirements for all types of mentally ill persons, recites that u [n]o examining physician shall be a relative of the person applying for the admission or of the person alleged to be mentally ill ’ \ Accordingly, although the benefits which attach to voluntary admission may be valuable, a withholding from those converted to such a status of the procedural safeguards surrounding their involuntary admission would serve to deny them the equal protection of the laws and, perhaps, due process of law as well. The Legislature has provided for judicial protection of those who may not be capable of making a decision with respect to their need for retention in a hospital for the mentally ill, and the statutory scheme may not properly be deemed applicable only to involuntary patients and withheld from those whose transfer from such a status to a voluntary admission may result from their own decision. As the Supreme Court stated in Baxstrom v. Herold (383 U. S. 107) —in which a person with a past criminal record was held entitled to a jury review of a determination with respect to his sanity which was available to all others civilly committed in New York—“ tejqual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made ’ ’ (p. 111). For purposes of judicial protection of the mentally ill, there is no basis or justification for distinguishing between involuntary patients and transferees from an involuntary status. Consequently, to paraphrase the Supreme Court’s opinion in the Baxstrom case (383 U. S, at p. 111), the Legislature of this State, having accorded involuntary patients the right to a judicial review Of their detention, u may not, consistent with the tiqual Protection Clause of the Fourteenth Amendment, arbitrarily withhold it ” *393 from mentally ill persons converted from an involuntary to a voluntary status.[5]
A narrow, illiberal reading of tbe statute would leave a voluntary patient without a disinterested review of bis detention, would deprive him of judicial and other valuable protections afforded involuntary patients and, by reason of that, deny Mm constitutional rights to which he is entitled. To avoid such result, and the consequent invalidation of the statute (cf., e.g., Matter of Van Berkel v. Power, 16 N Y 2d 37, 40), its provisions are to he read not in strictly literal fashion hut sympathetically so as to accord to such transferees these essential protections. This conrt has more than once read into a statute a requirement for the protection of a mentally ill person in order to save it from being stricken as unconstitutional. (See, e.g., People v. Bailey, 21 N Y 2d 588; People v. Lally, 19 N Y 2d 27.) In the Bailey case (21 N Y 2d 588, supra), for example, Judge Euattug, in his opinion for the court, pointed out that defendants convicted of sex crimes conid not receive an indeterminate sentence of one year to life without additional proof that they constituted a danger to society and were capable of being benefited by special treatment envisioned under tbe statutory scheme. Although the legislature did uot provide for a hearing on this issue, we read a requirement therefor into the statute, declaring that u [t]he policy of this court has always been to construe statutes in such a manner as to uphold their constitutionality. Indeed, we have just recently read a requirement for a hearing into an analogous statute in order to preserve its constitutionality n (p.596).
In short, then, we preserve the constitutionality of the statute before us by reading into it a requirement (1) that a mentally ill patient, converted from involuntary to voluntary status, be accorded a right to judicial bearing and review of his change in status as well as of his continued retention in such changed status and (2) that he be afforded the same sort of assistance from the Mental Health Information Bervice as is now furnished those who are in hospitals on an involuntary basis. It is hardly *394 necessary to add that the Legislature is, of course, free to amend the statute in any way it chooses as long as the interests of the involuntary-voluntary patient are constitutionally protected.
Little need be said concerning the Appellate Division’s conclusion that a “ person who has been adjudicated incompetent does not have the legal capacity to request, consent or agree to the conversion of his status ’ ’ from involuntary to voluntary. An adjudication of incompetency is in no way a decision or judgment that the person so adjudicated may not act in matters involving his personal status. He may, for instance, enter into a valid marriage (see, e.g., Weinberg v. Weinberg, 255 App. Div. 366) and make a valid will (see, e.g., Matter of Alexieff, 277 App. Div. 790, affg. 94 N. Y. S. 2d 32; cf. Matter of Widmayer, 74 App. Div. 336). Moreover, the statute expressly recites that the ‘ ‘ legal capacity to contract ’ ’ should not be required of any person applying for voluntary admission (Mental Hygiene Law, § 71, subd. 5).
The order of the Appellate Division should be reversed, without costs, and the matter remitted to the Supreme Court, Suffolk County, for a hearing with respect to the suitability and willingness of the incompetent to be a voluntary patient, in accordance with this opinion.

. Incidentally, it matters not whether the committee’s “ prosecution * * * of an independent application * * * for relief ”— by way of a special proceeding rather than an action■—was “brought in the proper form” (CPLR 103, subds. [b], [c], 105, subds. [b], [d]).

. Section 71 reduces the period of detention for a voluntary patient from 60 days to 15 days and thereafter permits his departure in 10 days (formerly 15 days under old § 71) “ after receipt of notice in writing from [him] of his intention or desire to leave such hospital ” (subd. 1). Patients “ informally ” admitted may leave at any time.

. Another protection afforded a voluntary patient is that he may not “be deprived of any civil right solely by reason of ” his voluntary admission nor may any such admission “modify or vary any civil right * * *, including but not limited to civil service ranking and appointment or rights relating to the granting, forfeiture or denial of a license, permit, privilege or benefit pursuant to any law” (§ 70, subd. 5).

. Section 73 provides that the director of the hospital must apply for a court order authorizing “continued” and “further continued” retention of a patient “if such patient does not agree to remain in such hospital as a voluntary or informal patient”.

. Since tbe present case involves only a person converted from an involuntary to a voluntary admission, we need not and do not consider tbe problem vís-á-vis a person originally admitted to tbe hospital on a voluntary basis.