Miriam WINTERS, on behalf of herself and all other persons similarly situated, Plaintiff,

v.

Alan D. MILLER, M.D., as Commissioner of Mental Hygiene of the State of New York; Alexander Thomas, M.D., as Director of the Psychiatric Division, Bellevue Hospital Center; Francis J. O'Neill, M.D., as Director of Central Islip State Hospital; and doctors on the staffs of Bellevue Hospital and Central Islip State Hospital whose names are unknown to plaintiff, Defendants.

No. 69–C–783.

United States District Court
E. D. New York.

Nov. 21, 1969.

Bruce J. Ennis, Jr., New York City, for plaintiff.

Louis J. Lefkowitz, Atty. Gen. of State of New York, Albany, N. Y., for defendants Miller and O'Neill; Joel H. Sachs, Asst. Atty. Gen., of counsel.

J. Lee Rankin, Corporation Counsel of City of New York, for defendant Thomas; Thomas F. Burchill, Asst. Corporation Counsel of City of New York, of counsel.

TRAVIA, District Judge.

At the outset, the Court must commend the attorneys representing the parties for their very fine moving and opposing papers, their thorough briefs and their articulate presentation of the facts and law on the oral arguments.

The facts surrounding this action are thoroughly and with particularity set forth in the papers on file but for the purpose of this memoradum of decision the Court shall set forth those facts which seem to bear more importantly on the issues raised in this case.

At about 4:00 o'clock P.M. on May 2, 1968, the plaintiff, Miriam Winters, was taken from her room in the King Edward Hotel to Bellevue Hospital, both in New York, New York, on the authority of New York City Police officers, one of whom apparently came from the 18th Precinct and had Badge No. 14010. The "Ambulance Call Report" of the Department of Hospitals indicates that the call was on an emergency basis by police radio.

Prior to her removal, Miss Winters had been on welfare for about ten years, and had only worked for a short period during her lifetime. She was taught at home for ten years until she was eighteen years old. Both her parents are deceased. Her father was a medical doctor in his lifetime. She is now 59 years old. There is some indication in the record that plaintiff had a previous history of psychiatric treatment at Kings County Hospital.

On March 21, 1968, before the occurrence of the incidents which are the basis of this case, Dr. Robert Reich, Psychiatric Consultant to the Department of Welfare, Wyckoff Welfare Center, wrote a letter to the Admitting Psychiatrist of Kings County Hospital, the body of which is as follows:

"Miss Miriam Winters of 55 Pierrepont Street, is a 58 year old woman, who is continuing to be disruptive in her hotel. She plays the radio all night and guards the public bathroom claiming it is her own. She has not washed in five years and her appearance is totally dirty and dishevelled. She has been unable to leave her room for some years and the hotel has been sending

food to her room. She has refused medical help of any kind. She has been sending letters to the Mayor's Committee demanding a room with a bath, but despite attempts by the department to help her move, she has been unable to leave the hotel room or to clean herself up so that she could be acceptable in a public hotel. There are no relatives who can help her and we feel that in her present condition she is a danger to herself in that if no food is brought to her she will starve, as well as her argumentative behavior and the guarding of the bathroom make it utterly impossible to live with others.

I would, therefore, recommend that she be sent to Kings County Hospital for evaluation and treatment of this chronic problem which has grown worse over the years."

Some time after Dr. Reich wrote this letter, plaintiff did move from where she had been living to the King Edward Hotel in Manhattan.

The events leading to the summoning of the police and the calling of the ambulance by the police are not entirely clear from the record. However, plaintiff's allegations that, on May 1 or May 2, 1968, the welfare case worker, a Mr. Karren (or Caron) and the hotel management sought, and failed, to have plaintiff change her room, and then sought the aid of the police, appear uncontradicted. Plaintiff claims that when the police arrived, they failed to give her sufficient identification or to state their reasons for seeking access to her apartment; that she then excluded them; that the room was then forcibly entered; and that plaintiff was taken to the hospital against her will.

No challenge is made to the legality of the commitment, and it appears to have complied with the New York Mental Hygiene Law, McKinney's Consol. Laws, c. 27, § 78(1) and (3).

Plaintiff claims that for at least ten years before her commitment, she had been a student and follower of the Christian Science religion. Followers of Christian Science hold that they should not submit themselves to medical treatment of a physical nature though psychological treatment is acceptable.

Upon her admission to Bellevue, plaintiff alleges, she informed the doctors who treated or spoke to her that she was a Christian Scientist. Dr. H. Blankfeld noted at that time that plaintiff refused to undergo a physical examination. He quoted her as saying, "I am a Christian Scientist and prefer you wouldn't." Notations to this effect appear at several points in the records kept by the hospital, indicating that the hospital should have been aware of plaintiff's claimed beliefs. Central Islip State Hospital, to which plaintiff was transferred on May 13, 1968, pursuant to Mental Hygiene Law § 72, as well as that hospital's doctors, were similarly aware of her claimed beliefs.

On the "Clinical Summary" sheet at Central Islip State Hospital appears a "Summary of First Admission" in which Dr. Christine Jordan reported that:

"Patient states to be religious but does not go to church. She is of the Protestant faith. 'I am an independant [sic] Christian scientist.' "

Plaintiff contends, although contested by defendants, that at both Bellevue and Central Islip, against her will, she was given injections of tranquilizers and also against her stated objections, she was given, and she took, various oral medications. She also states that these were taken contrary to her religious beliefs. On several occasions, plaintiff refused oral medication. A note on a hospital form at Central Islip for May 13 indicates that plaintiff was:

"Demanding—refused p. o. meds [oral medication]; Unco-operative [at] times—transfered [sic] 101
     F. Urban."

Later the same evening, plaintiff was found to be more cooperative, though subsequently she again refused the oral medication.

A Social Service Record Activity Summary by M. Koster, PSW Trainee II, reported, on May 17, 1968:

"Also indignant due to the fact that she is a Christian Scientist and is being forced to take medication. She is constantly berating the hospital and officials for violating her personal rights and privileges as a human being and as a Christian Scientist. She says she will seek court action to get her out and that she would fight these violations, to try and attain a victory on behalf of human rights for an American citizen and specifically for the beliefs of all Christian Scientists."

On May 18, 1968, it was noted that the plaintiff was,

"Very Lethargic. Taking meds p. o.— Resistive to many procedures because she states she is Christian Science."

While at Central Islip, it appears that plaintiff was given a smallpox immunization (May 17) and tetanus toxoid immunizations (May 13 and June 14). The hospital records indicate that medication, intramuscular or oral, was given daily while plaintiff was in the hospital.

Among plaintiff's possessions, held by Central Islip Hospital, was a Medicaid Card, No. 1479709, expiration date December 31, 1968, which must have been obtained on her application for such card. What she would do if it became necessary to use said card is not known.

While plaintiff was a patient at the two hospitals, a report and diagnosis of her condition was made frequently and proper entries appear in the hospitals' records. On May 2, 1968, Dr. H. Blankfeld reported on plaintiff's Admission Record at Bellevue that plaintiff was:

"[e]vasive, guarded, suspicious, negative [?]

Speech—Pressured, L.O.A. tangential, irrelevant, illogical

Thought—Delusions of persecution & grandeur

Denies hallucination, suicidal homicidal ideati [?]

Sensor-Clear—Oriented X3

Judgment/Insight — Nil — Spp — CSR—PT."

It appears that the notation "CSR—PT" was a preliminary finding of chronic schizophrenic reaction—paranoiac type. A nurse's report apparently of the same day indicates that plaintiff was admitted at 6:10 P.M.:

"* * * in ō [no] acute distress," and was placed in bed.

A social service worker, Lela Zaphirapoulos, reported, also on May 2, 1968, that:

"Pt. [patient] is very verbal, seemingly paranoid, tends to get off the subject to launch into discussions about religion, 'evil.'"

On May 7, 1968, two physicians, Sandra Grant and Gerald Ollins, examined plaintiff and signed a "two-physicians certificate," cf. N.Y. Mental Hygiene Law § 72, which reads in part:

"4. The patient showed the following psychiatric signs and symptoms:

Pt. is circumstantial, vague, evasive, hostile and paranoid. Her thinking is very rigid and concrete with impoverished personality. No insight and her judgment is nill. [sic] Her affect is inappropriate. Pt is not able to take care of herself and needs long term hosp.

5. Does the patient show a tendency to injure [herself]? poss; to injure others? poss

Explain [blank]

6. Mental diagnosis (if determined) CSR/paranoid type."

The "face sheet" of plaintiff's Bellevue record also has a notation, under the heading of Psychiatric Diagnoses, "CSR/par. type."

The records from Central Islip Hospital also repeat, in several places, the diagnosis of schizophrenia, paranoid type. On the "Clinical Summary" appears the following entry:

"*Outset and Symptoms*: Patient had a history of persecution and religious preoccupation. She had a Bible in her hand at the time of admis-

sion. She stated that she went to Bellevue only for a few days of rest, 'But I was tortured there. People bother me, they want to kill me with their medication.' "

The records indicate an improvement in plaintiff's condition while she was at the hospital. On June 18, 1968, plaintiff's status was changed from involuntary to voluntary. She was apparently not a discipline problem, and was granted an "Honor Card" on June 19, 1968. By June 22, 1968, a note by a B. Paul indicates that plaintiff was "Cooperative, Tends to Needs" and that she "Appears More Alert—."

Plaintiff was finally discharged in her own custody on July 18, 1968, at which time she was given a week's supply of a medication called "Mellaril," 50 milligrams, to be taken twice a day. Whether she took medication after leaving is not known. On the date of discharge, plaintiff's Clinical Summary sheet reads in part as follows:

> "*Mental Diagnosis:* SCHIZOPHRENIA; PARANOID TYPE.
>
> *Mental Condition:* MUCH IMPROVED."

Both hospitals' records are replete with information indicating that plaintiff was mentally ill, and that her illness had been immediately diagnosed as schizophrenia, paranoid type. Some of the incidents prior to her admission to Bellevue seem to confirm the diagnosis. The preliminary diagnosis made by Dr. Blankfeld on May 2, 1968, and the apparently independent interpretation of the social worker, were confirmed by subsequent diagnoses of the attending doctors.

Plaintiff has never been formally declared an incompetent nor has a committee of her person been appointed. As a "patient" in a mental institution under the Department of Mental Hygiene, she was under the jurisdiction and "custody" of the State Supreme Court, which had the responsibility " * * * for the safekeeping, support and maintenance * * of the incompetent * * *." The Court had the power to " * * * appoint a committee of the person * * *." Mental Hygiene Law § 100. Such a committee may be appointed without a trial in a summary procedure under § 102(1) and (2), upon the showing that the person for whom a committee of an incompetent is sought " * * * has been legally * * * admitted to an institution and is at the time a patient thereof. * * *." Since plaintiff could summarily have been found to be an incompetent, the lack of any formal incompetency finding has no effect on this litigation.

I

A. The defendants have separately presented motions to dismiss this action under F.R.Civ.P. 12(b) (1) and (6). Since material outside the complaint has been presented to the Court, the 12(b) (6) motions will be treated as motions for summary judgment. F.R.Civ.P. 12 (b) and 56. Plaintiff has cross-moved for summary judgment, and in addition, seeks " * * * (a) * * * an order pursuant to 28 U.S.C. Sec. 2284 convening a three-judge court to hear and determine this action; (b) * * * an order denying defendants' motions to dismiss the complaint; [and] (c) * * an order pursuant to Rule 23 of the Federal Rules of Civil Procedure determining that this action may be maintained as a class action. * * *."

B. Jurisdiction is founded on 28 U.S.C.A. § 1343(3) and 42 U.S.C.A. § 1983; plaintiff claims that the defendants have violated her constitutional rights while acting under color of State law in that the defendants, through their agents, required plaintiff to be fingerprinted and photographed, pursuant to New York Mental Hygiene Law § 34(9–a), in violation of plaintiff's rights to privacy under the Fourth Amendment to the Constitution, and in that the defendants forced plaintiff to be subjected to injections of, and the taking orally of, medicines contrary to plaintiff's religious beliefs, desires, and practices.

Plaintiff seeks injunctive relief declaring that the State return copies of her photographs and fingerprints to her, as well as a declaration that § 34(9–a) is unconstitutional.

■ Although plaintiff is no longer confined in a mental institution, this Court concludes that this action is not moot, contrary to defendants' contention. She seeks damages for the physical intrusion on her person contrary to her religious beliefs. In this aspect, this case is no different from any other personal injury action for damages. Since the State still retains the photographs and fingerprints allegedly taken contrary to the requirements of the Constitution, this portion of the case presents a controversy appropriate for adjudication.

■ C. Preliminarily, defendant Thomas has claimed that no cause of action has been stated against him because he has immunity from suit under the Civil Rights Act as the Director of the Psychiatric Division, Bellevue Hospital Center, an agency of the City of New York, and is thus " * * * an intricate part of the municipality. * * "

Although Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) did hold that a city is not subject to suit under the Civil Rights Act, 42 U.S.C.A. § 1983, the case also held, 365 U.S. at 172–187, that police officers, employees of the city, were liable to suit under the act. Officials of state and city hospital systems have specifically been held to have no immunity in suits brought under 42 U.S.C.A. § 1983 in at least two Second Circuit cases, Birnbaum v. Trussell, 347 F.2d 86 (2d Cir. 1965) and Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966). In Birnbaum v. Trussell, *supra*, the Court stated:

"It would nullify the whole purpose of the civil rights statutes to permit all governmental officers to resort to the doctrines of official immunity. The statutory condition of defendant's acting 'under color' of state or territorial law contemplates that he act in an official capacity. To the extent that state or municipal officers * * * violate * * * constitutional and federal rights, the Civil Rights Laws * * * 42 U.S.C. § 1983 * * * abrogate the doctrine of official immunity." 347 F.2d at 88–89.

Official immunity does not extend to the present defendants.

D. It should also be noted that no issue has been raised in the present case of the legality of the commitment of plaintiff or of the procedures used. That has been conceded. Cf. United States ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir. 1969); In re Buttonow, 23 N.Y.2d 385, 297 N.Y.S.2d 97, 244 N.E.2d 677 (1968).

■ E. Plaintiff's request for a three-judge court is made pursuant to 28 U.S.C.A. § 2281, which requires the convening of such a court in a case in which an injunction against the enforcement of a State statute on the ground that it is unconstitutional is sought. When a basis for equitable relief is, as here, " * * * at least formally allege[d]. * * *" a single judge District Court's jurisdiction is " * * * appropriately limited to determining whether the constitutional question raised is substantial * * *." Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 1296, 8 L.Ed.2d 794 (1962). If the alleged constitutional claim is found to be insubstantial, the single judge need not call a three-judge Court to determine the matter. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933); Swift & Co. v. Wickham, 382 U.S. 111, 114–115, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Such a claim is insubstantial when it is " 'obviously without merit.' " Ex parte Poresky, *supra*, 290 U.S. at 32, 54 S.Ct. 3.

■ Since the constitutionality of no statute and the granting of no injunctive relief are in issue on the question of the coerced taking of medication, the remaining issue is plaintiff's right to damages for defendants' actions. No re-

quirement for a three-judge Court arises on this issue. The question of the substantiality of the claim that Mental Hygiene Law § 34(9–a), is unconstitutional is discussed hereafter.

F. One should keep in mind, in discussing the questions which arise from the facts in this case, the duty and responsibility of the State to a patient in a mental institution and to the health and welfare of the people of the State, particularly in its care and treatment of a patient who is involuntarily committed because of some emergency, as contrasted with the relationship, in most cases voluntary, and the duty and responsibility of a private physician to *his* patient in *his* chosen hospital. In the latter case, the duty to the patient is paramount to all else, though expertise gained from such a relationship in preserving health may indirectly benefit the state. One must also bear in mind the distinction between voluntary and involuntary patients in mental institutions. Involuntary patients do not come in on their own but are brought in by police for emergency observation, care or treatment under § 78 of the Mental Hygiene Law. Voluntary patients are admitted under § 71 of that Law. Whether voluntary or involuntary, however, the Department of Mental Hygiene requires prior written consent before serious treatment such as electro shock or surgery may be performed. Affidavit of Bertram Pepper, M.D., September 10, 1969, p. 2.

## II

▆ Plaintiff claims that her rights were violated by the taking of her photographs and fingerprints at Central Islip State Hospital, under the authority of N.Y. Mental Hygiene Law, § 34(9–a).

Section 34(9–a) provides that upon admission of patients over 16 years old to hospitals within the Department of Mental Hygiene, photographs and fingerprints shall be taken of the patients (if their condition permits). One copy of the photo and of the fingerprints is to be retained at the hospital, not to be released except upon the Commissioner of Mental Hygiene's consent or upon a court order. A second copy of the fingerprints is to be sent to the Department's Albany office and to any central State fingerprint file.

The photograph and fingerprint section of the Mental Hygiene Law, § 34 (9–a), derived from § 34(9); which provides, in part, that the director of a state institution under the Mental Hygiene Law:

"* * * within three days after the reception of a patient, shall make, or cause to be made a descriptive record of such case. He shall also make or cause to be made entries from time to time of the mental state, *bodily condition* and medical treatment of such patient * * *." (Emphasis added.)

One purpose of the requirement of photographing patients is suggested by this derivation of the photographing section, namely, as an aid to keeping a record of the physical condition of a patient, who may require treatment or supervision because of potential physical or medical danger, at the time of arrival at the hospital.

Another use of fingerprinting and photographing may be as aids in locating patients who are lost while out of the hospital or on the hospital grounds. Plaintiff herself states that while she was at Central Islip she was given an "honor card" which permitted her to "* * * leave the ward and walk freely about the hospital grounds." If she had gotten lost, the photograph might have been of assistance in locating her. A photograph might also help to locate missing persons (i. e. the patient) or help locate friends or relatives of the patient who could help in treatment or diagnosis. *Cf.* N.Y.S. Bar Ass'n, Legis. Rept. No. 117, attached to affidavit of Bruce J. Ennis, plaintiff's attorney.

Fingerprints might be useful in identifying a patient, e. g. after an accident or if the patient, because of his condition, fails to give his name or gives an incorrect name, or to determine if someone who was admitted to an institution

has had previous mental care (whether under the same name, an assumed name, or a maiden name) which might be relevant to the treatment required.

Plaintiff argues " * * * that the taking of her fingerprints and photograph violated her Fourth Amendment right to privacy (the right to be let alone), her Fifth Amendment right to substantive and procedural due process, and her Fourteenth Amendment right to equal protection of the laws."

Plaintiff suggests that fingerprinting is an outrageous procedure for mental patients, since it is normally used only in criminal cases to aid in identifying a defendant or to determine if the defendant has a prior criminal record. To support this proposition, Campbell v. Adams, 206 Misc. 673, 133 N.Y.S.2d 876 (Sup. Queens, 1954) is cited. In that case, the Court held that when a boy had been picked up and fingerprinted on a criminal charge, but had only been adjudicated a "wayward minor," and not convicted of the criminal charge, he had a right to have the fingerprints returned. The Court was concerned with the stigma attached to fingerprints and with the retention of the prints on the boy's record although the offense was in effect eliminated from the record. However, it is apparent from the case itself that the Court was only talking in the context of (1) fingerprints taken in connection with a criminal case, and (2) a statute which provided that when a defendant was acquitted, he had a right to the return of the prints. No suggestion is made by the Court that it was dealing with the taking of fingerprints in connection with admission to a mental hospital or that it had given any consideration whatever to the situation presented here. However, the stigma attached to the taking of fingerprints in a criminal case is not present in the taking of photographs and fingerprints upon admission to a hospital; no criminal record is involved at all.

Misemphasizing Davis v. Miss., 394 U. S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), plaintiff suggests that the tak-

ing of fingerprints and a photograph are, by themselves, invasions of privacy. However, on the question of fingerprints *per se* as invasions of privacy, the *Davis* Court only said that "[f]ingerprinting involves none of the probing into an individual's private life and thoughts which marks an interrogation or search." 394 U.S. at 727, 89 S.Ct. at 1398. Instead, *Davis* turned on the fact that there was a *detention* without probable cause, and therefor a seizure of the defendant in violation of the Fourth Amendment. Exclusion of the fingerprints taken at the illegal detention was then based on the ordinary exclusionary rule of unconstitutionally seized evidence under Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). No such unlawful incarceration is present here.

As plaintiff admits, assuming the fingerprint taking to be some invasion of privacy under the Fourth Amendment, it can only be an "unreasonable" search or seizure in the present context if "[t]he state has no legitimate need for, or interest in, plaintiff's fingerprints or photograph."

However, as already seen, New York has a legitimate interest in taking these fingerprints and photographs.

The claim that "substantive due process" has been violated because fingerprints and photographs were taken without the State's having " * * * a substantial and legitimate state purpose" raises the same question, and requires the same answer, as the issue of "right to privacy."

As to the "procedural due process" argument, the plaintiff has already conceded, see *supra* at p. 1163, that her commitment was lawful. In *Davis*, the Court was concerned with taking of prints when the incarceration was unlawful.

Finally, plaintiff claims that she has been denied the equal protection of the laws, since she, as an inmate of a hospital run by the Department of Mental Hygiene, was fingerprinted and photo-

graphed, while inmates of local or private institutions are not required by law to undergo the same procedures. This argument assumes, however, that the State has made some irrational and discriminatory distinction between inmates of both types of hospitals, although the same patient could be admitted to either. *Cf.* Mental Hygiene Law § 72(1); § 2 (4–a).

However, although the Mental Hygiene Law has detailed provisions for the regulation of state institutions under the Department of Mental Hygiene, *cf.* Mental Hygiene Law § 11(1), the State of New York has only undertaken to license and supervise private mental institutions. Mental Hygiene Law § 424. No detailed provisions of how these private institutions are to be run are set out in the law. Thus, the State, in providing for reasonable rules and regulations of the State's institutions does not also have to provide a detailed code for private institutions, which are left to determine their own procedures. The State only requires that private institutions live up to the terms of their licenses. Mental Hygiene Law § 424(4).

Plaintiff seeks return of the fingerprints and photographs because criminal defendants, if acquitted, have a right to reacquire their prints and photos. This case does not deal with a criminal prosecution. The prints were not taken because plaintiff was a criminal, and the right to take them does not in any way depend upon plaintiff's having actually been adjudicated to be an "incompetent." The purposes of, *e. g.*, aiding in determining if plaintiff had previously been treated in a State mental institution require that, if in fact she has been treated, the means of identifying her in the future be retained. Unlike a criminal prosecution, where retention of the prints might aid in future arrests to the detriment of the defendant, here the retention of the prints and history becomes important to treatment.

■ The claim that New York Mental Hygiene Law § 34(9–a) is unconstitutional is "obviously without merit" and consequently is insubstantial.

### III

■ Plaintiff, a Christian Scientist, contends that the administration of medical treatment while she was involuntaily committed to a state mental hospital, was against her religious beliefs and violated her constitutional rights of free exercise of religion under the First Amendment as applied to the States through the Fourteenth Amendment. Since defendants' acts were under color of State law, plaintiff seeks damages from them under 42 U.S.C.A. § 1983.

■ The Free Exercise clause of the First Amendment has generally been divided into two branches: the freedom to believe and the freedom to act. Freedom of religious belief is absolute. "Compulsion by law of the acceptance of any creed or the practice of any form of worship is strictly forbidden." Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563 (1961); Cantwell v. Conn., 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). "However the freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions." Braunfeld v. Brown, *supra*, 366 U.S. at 603, 81 S.Ct. at 1146; Prince v. Mass., 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

To deal with the proposition that the treatment given plaintiff violated her constitutional rights, the parties have referred this Court to several cases involving surgical operations and blood transfusions of persons who objected on religious or other grounds. *E. g.* Application of President & Directors of Georgetown Col., 118 U.S.App.D.C. 80, 331 F.2d 1000, 9 A.L.R.3d 1367, reh. den. en banc, 118 U.S.App.D.C. 90, 331 F.2d 1010 (1964); In re Clark, 185 N.E.2d 128 (Ohio Com.Pleas 1962); People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769, 30 A.L.R.2d 1132 (1952); Raleigh Fitkin-Paul Morgan Mem. Hosp. v. Anderson, 42 N.J. 421,

201 A.2d 537 (1964); Collins v. Davis, 44 Misc.2d 622, 254 N.Y.S.2d 666 (Nassau 1964); Erickson v. Dilgard, 44 Misc.2d 27, 252 N.Y.S.2d 705 (Nassau 1962); In re Brooks' Estate, 32 Ill.2d 361, 205 N.E.2d 435 (1965).

These cases suggest that when there are strong interests of the State other than the welfare of the patient alone, the patient's religious objections may be ignored when treatment is necessary. Thus, if the treatment of an adult would affect the welfare of a dependent child, treatment, such as operations or transfusions, has been allowed. *E. g.* Raleigh Fitkin-Paul Morgan Mem. Hosp. v. Anderson, *supra*; Application of President & Directors of Georgetown Col., *supra*. And to save a child from imminent death, parents' religious objections may be ignored. *E. g.* In re Clark, *supra*; People v. Labrenz, *supra*; People v. Pierson, 176 N.Y. 201, 68 N.E. 243, 63 L.R.A. 187 (1903) (criminal penalties for parents' failure, on religious grounds, to summon medical aid for dying child).

Similarly, the public interest in preventing the spread of communicable disease permits compulsory immunization, enforced by criminal penalties, against objections, Jacobson v. Mass., 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1904), including objections on religious grounds. Mosier v. Barren County Board of Health, 308 Ky. 829, 215 S.W. 2d 967 (1948).

Where the ability of the patient to choose his type of treatment is unquestioned, because his mental capacities have been unimpaired, he is allowed to choose the scope of the treatment, even to the extent of refusing medically necessary blood transfusions. In re Brooks' Estate, *supra*; Erickson v. Dilgard, *supra*. Contrast Collins v. Davis, *supra* (patient in comatose state; operation permitted). However, in the In re Brooks' Estate case, *supra*, the Court made clear that its ruling was made in a situation where there was no public interest, such as the presence of dependent children, involved.

Although these cases are instructive on the problem of treatment of persons (competent and incompetent) against their religious beliefs, they ultimately are inapplicable to the present case. This case is the first to come to this Court's attention which concerns the treatment of involuntary patients in State mental institutions.

In mental illness cases, the public interest in treating and curing patients is greater than the public interest is in cases of physical illness. Most patients who are physically ill will be able to determine that they need treatment and, when informed by their physicians, will be able to make a reasoned decision as to the type of treatment to which they wish to subject themselves. But a mental patient, because of the nature of the illness, may be unable either to seek appropriate treatment or to determine what treatment to allow. For the physically ill person, where there are no dependent children or communicable diseases involved, the danger from a refusal, on religious or any other grounds, to allow a particular type of treatment may be that the patient will be seriously ill for a period or may die. Only the patient and his immediate family are likely to be aggrieved or injured as a result. On the other hand, where the mental patient is not properly treated, the condition may progressively worsen, and the patient may become a public burden and expense. Badly needed beds in mental hospitals may be occupied by those (few or many) who refuse treatment which competent and expert medical practitioners prescribe. Where the proposed treatment is conducive or necessary for the cure or ameliorition of mental illness, the failure to provide it would be a step backward in the history of mental hygiene.

Who else is better qualified to give care and treatment than those in whom the State places its trust to care for and treat the mentally ill?

For those for whom advanced medical treatment is not provided the danger exists that a cure which might be effected

would be lost. Mental institutions would potentially be limited to acting as custodians of those mentally ill persons, for their own safety and that of the public as was true in earlier periods of caring for the mentally ill. *Cf.* Marsh W. Breslin, Preface to McKinney's New York Mental Hygiene Law, "History of Mental Hygiene Law," xii-xiii. It was only gradually that it was recognized " \* \* \* that insanity as such was a condition akin to a physical ailment and one in which care and cure were becoming the fundamental objects \* \* \*." *Id.* at xiii. No longer is mere custody of the mentally ill person the primary aim of mental institutions. Instead, it is " \* \* \* only a requisite and a device by which those who require treatment and care must be controlled and detained for their own benefit and for the benefit of the public in general. \* \* \* " *Id.* at xiv. " \* \* \* [A]nalysis of the present Mental Hygiene Law indicates clearly that the authorities have made tremendous advances in the custody, care and treatment of the mentally ill, mental defectives and epileptics. The present law has also begun consideration of preventive procedures insofar as those subject to mental incapacities are concerned by the establishment of research projects, public education and a concerted effort to recruit and train adequate personnel for the care of those thus afflicted." *Id.* at xiv-xv.

Involuntary patients in mental institutions present special problems. As in the present case, they are frequently brought into the institution on an emergency basis. They are frequently severely mentally ill. Because of an intrusion on the public, either by disorderly conduct, *cf.* Mental Hygiene Law § 78 (3), or by action which is a danger to the individual or to others, the patient may have to be brought in forcibly. To restore the patient to his freedom or to retain him in custody without treating him properly would be a violation of the duty of the Department of Mental Hygiene to both that patient and the public. Without treatment, the patient's dangerousness or disorderliness is likely to continue unabated. In the present case, where there is an indication that the plaintiff's illness had been getting progressively worse, retaining her or allowing her out of the hospital without either curing her or acting to arrest the progression of the disease would be grossly improper. Faced with a patient who had a chronic schizophrenic reaction of a paranoiac type, and who was brought into the hospital by an emergency ambulance, the doctors had to act in accordance with their expertise in treating mental illness. As plaintiff's condition improved, and the immediate emergency subsided, appropriate treatment was still necessary to induce the improvement in the plaintiff's condition indicated in the records. For the doctors to have done less would have been a violation of their obligations to the people of New York to seek to cure mentally ill patients so that they will no longer be dangerous or disruptive to themselves, or to the public, and so that they will no longer occupy scarce space in public mental health institutions.

It appears from the records that the plaintiff had no relatives and only two friends who could be called upon by the hospitals for their help. One was a Mrs. Gertrude Butler, who was called on May 2, 1968 (the date of admission) and who stated she could not visit plaintiff. The other was one who might have helped, Mr. Benjamin Rippe, who, plaintiff stated, was her Christian Science Practitioner. However, he was called but he apparently did not return the call.

In the Social Service Record, under the title "Activity Summary" the following appears:

"July 8, 1968: \* \* \* Social worker called Mrs. Butter [sic] that afternoon, asking if this was possible [if plaintiff could stay with Mrs. Butler as requested by plaintiff] and was told that it was not."

Also Dr. Reich's letter, *supra* at p. 3, states:

" * * * no relatives who can help and we feel that in her present condition she is a danger to herself. * * * " "This chronic problem has grown worse over the years."

By a "Notice of Application and Patient Admission," dated May 6, 1968, plaintiff was informed of her right to seek the aid of the Mental Health Information Service. In the three months, during which she was confined as an involuntary and voluntary patient, no appropriate application was made by, or on behalf of, the plaintiff in spite of the availability of the protections accorded under the Mental Hygiene Law and the procedures of the Mental Hygiene Department and particularly Mental Hygiene Law §§ 88 and 70(6), (7), which set up the New York Mental Health Information Service, a service created as a neutral advisor which could act independently to take care of patients, to help them with their problems and to seek the aid of the Court where necessary. Thus, the hospitals were left to their own discretion, without the aid of a relative, friend, or the Information Service in determining what treatment was required for plaintiff's condition.

The decisions of the Courts in the cases cited indicate that a limitation on religious practices is proper when there is a compelling public interest which conflicts with the individual's private religious interest. In such circumstances the government may protect and promote the general health, safety and welfare of its citizens even where the result proves to be inconvenient or offensive to an individual's religious belief without the government's invading the liberties protected by the First and Fourteenth Amendments.

Such an interest in public health and welfare exists here. We are not dealing here with a person who voluntarily sought admission to a hospital for certain treatment, but, one who was brought in involuntarily and placed under the care of the State. Thus, circumstances justify the interference of the State with the patient's personal interests. The hospitals acted in a manner of guardians when they administered treatment; they were acting both in the interests of the plaintiff and of the State in assuming responsibility and ordering treatment.

In contrast to the admission procedures presently in effect, plaintiff originally sought to bar the admission of patients to a State mental hospital prior to a full Court hearing. This argument was withdrawn at the hearing.

Plaintiff's complaint may be construed as contending that no medical treatment may be given to a patient in a State mental institution unless there has been a prior court hearing. The statements of Dr. Bertram Pepper in his affidavit regarding the commitment process are appropriate to this question, too:

" * * * [I]ndividuals are admitted to State mental hospitals suffering from acute psychotic symptoms. To delay the admissions of patients until a full-blown court hearing can be held, may result in a distinct danger to the patient or to society.

* * * * * *

"2. Whether a person should be committed to a State mental hospital is a decision which should, in the first instance be made by doctors, not judges. As in many other areas of the law, the court should defer initially to the expertise of those individuals who have the responsibility of diagnosing and treating mentally ill patients on a daily basis."

* * * * * *

"3. To foist upon the courts the initial responsibility of determining whether a person should be committed to a State mental hospital would be an awesome burden. Simply stated, the court is not equipped to handle this type of problem. The courts simply do not have the doctors, psychiatrists and facilities to examine individuals

prior to their commitment to a mental hospital. When it is alleged that an individual should be treated as mentally ill, all a court can do is to send him to a hospital such as Bellevue, for observation and a report."

\* \* \* \* \* \*

"4. To order a hearing prior to admission would immediately cast the prospective patient and the Department of Mental Hygiene in an adversary position. This would frustrate the entire method of treatment in state hospitals which attempts to have the doctors and staff communicate with the patient on a cooperative basis in an attempt to resolve the patient's problem."

As the Supreme Court stated in a different context, "[e]ven the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from injury." Cantwell v. Conn., *supra*, 310 U.S. at 306, 60 S.Ct. at 904. The State interest here is in protecting its citizens from bearing the burden of a mentally ill person, whether committed in a hospital, without adequate care, or out of the hospital, where the plaintiff might well have continued to conduct herself " \* \* \* in a manner which in a sane person would be disorderly \* \* \*." N.Y. Mental Hygiene Law § 78(3), and from having badly needed beds in mental hospitals occupied by patients who cannot be treated.

▉ No question arises here of the hospitals' having inquired into and rejected the validity of plaintiff's religious beliefs. *Cf.* United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). Instead, the doctors acted within the expertise of their medical training to effectuate the State's interest in treating and curing, as far as possible, the plaintiff's illness. Plaintiff's beliefs did not determine the scope of permitted actions by the defendants' agents nor did the defendants discriminate in any way against plaintiff because of her beliefs. It is not every act of State offi-

cials which happens to intrude on an individual's rights as protected by the Constitution which allows that individual to recover for that intrusion. When medical officials have acted in good faith to carry out their obligations to the State and its interests, without intentionally seeking to give a mentally ill patient a particular treatment just because it is objectionable to her on religious grounds, they may not be liable to that patient when the appropriate treatment has been given and the patient objects. *Cf.* Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Since in the present case no question arises as to the good faith of the medical authorities who treated plaintiff, this is such a case.

Plaintiff has suggested that the actions of the doctors here " \* \* \* broadly stifle fundamental personal liberties \* \* \* " and that " \* \* \* less drastic means for achieving the same basic purpose," Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed. 2d 231 (1960), were available. She suggests that various means of psychological care, not involving physical treatment, were available and should have been used. First, it is difficult to see how there was a broad stifling of liberties here. However, even if plaintiff's liberties were "broadly stifled," the medical officials in charge of plaintiff's case in the hospitals acted with their best judgment of appropriate treatment to be given. Plaintiff must, in such circumstances, do much more than merely suggest that the doctors could have given some other form of treatment, and then shift the burden onto the defendants to show that their treatment, given according to their reasoned judgment, was the best treatment available for the particular mental illness they were concerned with, or that no other treatment was available. The very nature of treatment for mental illness requires that doctors have great discretion in the different means to be used to treat their patients, especially where immediate and emergency treatment must be given.

No serious operation was ever conducted, nor was drastic treatment given. The only indication along these lines, as appears in the hospital records, is that the plaintiff was injected with certain medication. Under the circumstances the decisions of the doctors to utilize such treatment was well within the area of their competence. She was sick, as the immediate diagnosis showed, and in need of immediate help.

Plaintiff's constitutional rights have not been violated by the defendants.

## IV

 This Court does not agree with the contention of abstention on the question of the validity of Mental Hygiene Law § 34(9–a), as argued by the defendants. There is no ambiguity in the language of this Statute which might affect its validity. This Court does have the power initially to hear questions of constitutionality. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

Since none of the plaintiff's allegations as to the constitutionality of the Statutes involved are substantial, the complaint as to Mental Hygiene Law § 34(9–a), fails to state a claim upon which relief can be granted.

This decision is limited to the constitutional claims raised under 42 U.S.C.A. § 1983; no intimation is made as to plaintiff's rights in a common law action for battery against the defendants or their agents under Schloendorff v. Soc. of the New York Hospital, 211 N.Y. 125, 129–130, 105 N.E. 92, 52 L.R.A.,N.S., 505 (1914). See also N.Y. Mental Hygiene Law § 44 (actions for damages).

 The contention of the plaintiff that this action may be maintained as a class action is rejected, Since the question of constitutionality of Mental Hygiene Law § 34(9–a) is not substantial, the claim must be dismissed. Ex parte Poresky, *supra*. Thus, there is no need to determine whether this action may be brought as a class action or not. The claim for damages for the injections contrary to plaintiff's religious beliefs and wishes is a claim belonging to plaintiff alone, so that there is no class involved. *Cf.* F.R.Civ.P. 23(a), (b) (2).

Accordingly, it is

Ordered that the third cause of action of the complaint is dismissed for failure to state a substantial Federal claim upon which relief could be granted; and it is further

Ordered that the defendants are entitled to summary judgment against the plaintiff dismissing all other claims of the complaint without costs; and it is further

Ordered that all other motions in this matter before the Court are denied.