OPINION OF THE COURT
Troy K. Webber, S.
In this contested proceeding, petitioner Angel A. seeks appointment as guardian of the person and property of his daughter, Yvette A., an alleged mentally retarded person under section 1750 of the Surrogate’s Court Procedure Act. Petitioner also seeks the appointment of Rita A., his wife and Yvette’s stepmother, as standby guardian and of Natalie A., Yvette’s half-sister, as first alternate standby guardian. The petition is opposed by all of the other parties, including Mental Hygiene Legal Service (MHLS), New York Civil Liberties Union (NY-CLU), and New York Lawyers for Public Interest (NYLPI),[1] as well as by the guardian ad litem (GAL) for Yvette. The NYCLU and NYLPI have also requested that the matter be referred to the Supreme Court (New York County) for a guardianship proceeding under article 81 of the Mental Hygiene Law rather than under article 17 of the SCPA.
The following facts are undisputed. Yvette was born on October 6, 1966 and was diagnosed with mental retardation by the time she was 2X!% years old. Yvette’s mother died in 1969 and Angel A. took care of her at home for about IV2 years. Then, in 1971, Angel A. placed Yvette at the Willowbrook State School. She remained there until March 30, 1977, when, as a result of a class action litigation on behalf of the residents of Willowbrook,[2] she was transferred to the Episcopal Social Services group home. She has remained there since that date.
*947 Yvette is blind, has a history of seizures and anxiety, and exhibits aggressive and self-injurious behavior. She requires assistance with daily living, including feeding and hygiene. While she can make simple choices such as choosing certain food and drink, she is unable to attend to her finances, make complex decisions, medical or otherwise, or maintain her medical appointments. Yvette cannot self-medicate, is not travel-trained and, in part as a result of her blindness, requires one-on-one supervision at all times. Yvette can communicate by simple sounds such as asking for soda and requesting hugs when she meets someone. She currently attends a day program at the Esperanza Center twice a week. Petitioner, together with the CAB,[3] has been Yvette’s corepresentative since 2006.[4]
The petition is supported by certifications from two medical doctors, both of whom have concluded that Yvette is severely and permanently mentally retarded[5] and that she does not have the capacity to make health care decisions, as defined by subdivision (3) of section 2980 of the Public Health Law.[6] Both doctors have also concluded that Yvette’s presence at a hearing should be dispensed with in view of her inability to understand the proceedings and the possibility that her attendance might cause her harm.
Hearing Testimony
A hearing was held before me on February 25, 2010.[7] Petitioner testified that he seeks guardianship of his daughter because he loves her and wants to be involved in her care. He further testified that he regretted having not been in her life for a substantial period of time. According to petitioner this absence *948 was due to his inability to cope with Yvette’s condition at the same time as he was dealing with the mental and emotional stresses of having two children who are disabled.[8] Petitioner acknowledged that he had minimal to no contact with Yvette for a period of approximately 16 years, from 1990 to 2005.[9] In essence, petitioner severed all ties to Yvette during this period.[10] He also stated that he had believed it was in Yvette’s best interests that he leave Yvette’s care to the home, as well as to the other entities having an interest in her welfare as a result of her being a member of the Willowbrook class, which he had regarded as better equipped than he to meet her needs.* [11] However, according to petitioner, he is now very concerned for his daughter’s health and safety in view of certain incidents that have come to light and recent medical developments. As a result, he is considering moving Yvette to another facility and is seeking permission to investigate and possibly initiate a lawsuit against the appropriate parties on Yvette’s behalf.
Petitioner conceded that he has not developed a plan for Yvette’s continued care and treatment. Further, he was unclear as to her exact medical condition and prognosis.
Objectants have raised concerns as to petitioner’s motives and commitment to Yvette, largely in light of (1) his past long period of noninvolvement with Yvette, (2) the uncertainty as to the level of the involvement that he will maintain in the future, and (3) objectants’ fear of harm to Yvette if petitioner fails to be involved in her care and again becomes unreachable to give authorizations necessary to her well-being. The GAL for her part has questioned petitioner’s account of his level of current involvement in Yvette’s care. Objectants have also raised *949 concerns regarding petitioner’s plans to move Yvette from the facility in which she currently resides.[12] MHLS and the GAL argue that, in view of the nature of Yvette’s physical and mental disabilities, moving her from the only home and people she has known for more than 33 years would be an extreme hardship for her and is unnecessary absent an indication that they pose some current danger to her. MHLS and the GAL also oppose the appointment of the proposed standby[13] and first alternate standby guardians, who are not actively involved in Yvette’s life.[14] As stated above, the NYCLU and NYLPI have requested that this petition be denied and the matter referred for a Mental Hygiene Law article 81 guardianship proceeding in the Supreme Court. In support of such request, they argue that, under all of the circumstances, a guardianship tailored to Yvette’s special needs under article 81 would afford her more protection than would an SCPA article 17-A guardianship. Their position is based upon certain assumptions that warrant the following examination.
Discussion
Article 17-A, enacted some 40 years ago, provides for the appointment of a guardian for a mentally retarded or a developmentally disabled person.[15] Article 81 was enacted in 1992 to provide for the appointment of guardians for “persons with incapacities to make available to them the least restrictive form of intervention which assists them in meeting their needs . . . [and which] permits them to exercise the independence and self-determination of which they are capable” (Mental Hygiene Law § 81.01). However, as the preamble to article 81 makes clear, it was designed as a more flexible and less intrusive *950 replacement for the century-old system of committee[16] and more recent system of conservatorship.[17] Article 81 does not purport to repeal article 17-A.[18] Moreover, the legislative history of article 81 does not suggest that it was further intended as an alternative to,[19] or amendment of,[20] SCPA article 17 or 17-A.
Although, article 17-A does not specifically provide for the tailoring of a guardian’s powers or for reporting requirements similar to article 81, the court’s authority to impose terms and restrictions that best meet the needs of the ward is implicit in the provisions of section 1758 of the SCPA, under which
“the court shall have and retain general jurisdiction over the mentally retarded . . . person for whom such guardian shall have been appointed, to take of its own motion or to entertain and adjudicate such steps and proceedings relating to such guardian, ... as may be deemed necessary or proper for the welfare of such mentally retarded . . . person.”
Moreover, under SCPA 1755[21] the court has the power and authority to modify an existing order appointing a guardian of the person or property of an article 17-A ward to adapt the *951 terms of the guardianship to new circumstances.[22] The statute does not suggest that the extent and substance of such “modification” are in some respects more limited than the needs of the ward herself. Indeed, the legislative history of article 17-A militates against reading the statute as thus limited.[23] By logical extension, a court that has the power to modify a guardianship order once it has been issued to meet the needs of the ward surely also has the power to tailor the order to meet such needs at the outset.
Based on the undisputed facts, the documents submitted, and the testimony, the court finds that Yvette is a mentally retarded person whose condition is permanent, thus meeting the requirements of SCPA 1750 (1). The court also finds that it is in Yvette’s best interests to have her father appointed as guardian of the person under SCPA article 17-A.[24] However, mindful of petitioner’s history as well as the grounds for concern as to his continued involvement in Yvette’s care, the court concludes that such guardianship should not be without restriction. Accordingly, petitioner is directed to file duly acknowledged initial and annual reports as guardian of the person with the Guardianship Department of this court. The initial report is due within six months of the date letters are issued. In each report, petitioner must identify his current address and telephone number(s). He must also include Yvette’s current residence, list the dates and times of his visits to her since the date of his appointment (a minimum of six times) or the last report (a minimum of 12 times per calendar year), as is applicable, report on Yvette’s current medical condition (identifying the medical or other reports on which such report is based) and any changes in her care since the date of his appointment or the last report, as is applicable. In the same report, he shall identify Yvette’s daily activities, including her frequency of attendance and participation at the day program, list the governmental or other financial *952 benefits that are received by or for her, and identify any proposed plan that he has to change Yvette’s living arrangements, daily activities or care and the reason(s) for such proposed change(s).
The annual report shall be due on or before the 1st of March following the close of the calendar year immediately preceding.
The CAB will continue its role in overseeing Yvette’s care and as her representative as provided and defined in the Willow-brook permanent injunction referenced above.[25] Petitioner is prohibited from taking any steps to remove the CAB as a representative for Yvette. Petitioner is also restrained from moving Yvette or changing her day program without further order of this court.
Accordingly, letters of guardianship of Yvette’s person shall issue to petitioner, subject to the above requirements and restrictions, upon his qualifying according to law.
The court also finds that sufficient proof has been presented for the appointment of a guardian of the property to protect Yvette’s rights and interests. Accordingly, restricted letters of guardianship of the property of Yvette are granted to petitioner. Petitioner is restrained from compromising any cause of action and from collecting any proceeds thereof and from taking possession or control of any of Yvette’s property until further order of this court. Details of any pending litigation or of any information uncovered which might lead to possible litigation on Yvette’s behalf must be included in petitioner’s initial or subsequent annual reports, as is applicable.
Based on Rita A. and Natalie A.’s noninvolvement in Yvette’s life, petitioner’s requests for their appointment as standby guardian and first alternate guardian, respectively, are denied without prejudice.

. The NYCLU and NYLPI are co-counsel for Yvette in her capacity as a plaintiff in the Willowbrook class action. (See n 2 below.)

. In 1972 a class action litigation was commenced in the United States District Court for the Eastern District of New York charging that the State of New York violated the constitutional rights of the residents of the Willow-brook State School. That action, now captioned New York State Assn. for Retarded Children v Paterson (72 Civ 356, 357) (JRB) (Willowbrook class), is currently pending before the Honorable Raymond J. Dearie. A permanent injunction, dated March 11, 1993, was issued which granted class members enhanced rights, including representation of members by the Consumer Advisory Board (CAB) to protect members’ interests.

. The CAB is an independent agency established pursuant to the provisions of sections S and W of appendix A to the final judgment entered on May 5, 1975 in the Willowbrook class action. A copy of the order establishing the CAB is reported at New York State Assn. for Retarded Children, Inc. v Carey (393 F Supp 715 [ED NY 1975]). The mandate of the CAB is to act in loco parentis and to provide necessary advocacy for Willowbrook class members above the treatment and services provided to members by the New York State Office of Mental Retardation and Development Disabilities (OMRDD) for as long as any such class member shall live (see Willowbrook permanent injunction appendix IT 7).

. The CAB had been Yvette’s sole representative from 1994 to 2006.

. The Metro North I.C.F. psychological summary by the clinical coordinator submitted by NYCLU and NYLPI in their opposition papers also states that Yvette is mentally retarded, but that based on recent tests Yvette’s condition is of profound mental retardation as opposed to severe.

. SCPA1750.

. Pursuant to SCPA 1754 (3), based on the medical certifications, it was determined that Yvette’s presence at the hearing be dispensed with.

. Petitioner and his ex-wife, Rita A. have a son, Yvette’s half-brother, who has cerebral palsy and who underwent surgery in 1989 and was suffering from complications of that surgery in 1989/1990.

. Petitioner testified that he sporadically visited and was kept apprised of Yvette’s care by relatives who also sporadically visited Yvette from 1989 to the mid-1990s.

. Since 2006 petitioner testified that he has become actively involved in Yvette’s care and visits with her for one-half hour or more, on a weeldy or biweekly basis.

. The record reflects that petitioner could not be reached in 2001 when his consent was required for a necessary medical procedure for Yvette. Petitioner testified that he had no knowledge of any attempts to contact him or obtain his consent. It is unclear why the home (or any other entity or person involved in Yvette’s care) did not use other options available under the OMRDD regulations or Public Health Law, including applying to this court to obtain the necessary consent.

. Petitioner testified that he has not explored options for alternative living arrangements and has no current plans to move her, but hopes ultimately to move her to a more private and secure home preferably outside of New York City.

. Specifically, objectants questioned whether Rita A. would be able to devote time to Yvette’s care because she is the primary caretaker of her adult disabled son.

. Petitioner testified that Rita A. resumed visiting Yvette on a regular basis in January of this year, but that Natalie A. has not visited Yvette on a regular basis since they were both children, circa late 1980s or early 1990s.

. As originally enacted in 1969, article 17-A applied only to a person with mental retardation. The statute was repealed and replaced by the current statute in 1989 to address the needs of developmentally disabled persons.

. Repealed Mental Hygiene Law article 78 derived from chapter 17, title 6 of the Code of Civil Procedure originally revised from Laws of 1874 (ch 446, tit 2, § 1), amended by Laws of 1894 (ch 504) and Laws of 1895 (ch 946).

. Repealed Mental Hygiene Law article 77 was enacted by Laws of 1972 (ch 251).

. In the 1990 amendment to article 17-A the Legislature directed a study to reevaluate the statute and OMRDD formed a working group to study and suggest revisions to article 17-A to reflect guardianship reforms similar to article 81, but no legislation resulted (see Bailly, Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01, at 10).

. See Matter of Lavecchia, 170 Misc 2d 211, 213 (Sup Ct, Rockland County, Nov. 6, 1996) (article 81 was not intended as an alternative to SCPA articles 17 and 17-A appointment of a guardian for a minor or a mentally retarded or developmentally disabled person, respectively).

. See Matter of Schulze, 23 Misc 3d 215 (Sur Ct, NY County 2008).

. SCPA 1755 provides that
“any person on behalf of any mentally retarded . . . person for whom a guardian has been appointed, may apply to the court having jurisdiction over the guardianship order requesting modification of such order in order to protect the mentally retarded . . . person’s financial situation and/or his or her personal interests . . . The court shall so modify the guardianship order ... if the interests of justice will be best served including, but not limited to, facts showing the necessity for protecting the personal and/or financial interests of the mentally retarded . . . person.”

. As noted in the text, under SCPA 1758 the court retains general jurisdiction over the mentally retarded person for whom it appointed a guardian. The power to modify the guardianship order under SCPA 1755 is an exercise of such general jurisdiction.

. See the legislative history of the repealed 1969 version of the statute. (Governor’s Approval Mem, 1969 NY Legis Ann, at 586 [“The bill will also enable a protective plan to be tailored to the individual needs of a retarded person by providing a broad flexibility in the types of guardianships that can be utilized”].) The 1989 enactment specifically provides for modifications, i.e., tailoring of powers (SCPA 1755, supra n 21).

. SCPA 1754 (5).

. Supra n 3.