*766 OPINION OF THE COURT
Kristin Booth Glen, S.
This case presents an issue of significant concern:
Can SCPA article 17-A meet constitutional standards in the absence of a requirement of periodic reporting and review? The facts of this case place the issue in stark relief.
Facts
Mark C.H. was adopted five days after his birth by Marie H., a woman of significant means, who subsequently also adopted his brother, Charles A.H. From the beginning, Mark suffered from disabilities and, at the age of seven, was diagnosed with autism. Marie traveled widely and spent substantial sums seeking to cure or improve Mark’s condition, but with little success. When she was diagnosed with terminal cancer, and no longer able to care for him at home, Marie was advised to find an appropriate institutional placement for Mark; in 2003, at the age of 14, he entered the Anderson Center for Autism in upstate Staatsburg, New York, where he resides to this day. Marie H. passed away in 2005, leaving an estate of approximately $12 million which passed into trusts for Mark and Charles. The instant proceeding for the appointment of an SCPA article 17-A guardian for Mark was commenced by petitioner in 2007.[1]
In the reports of health care providers at Anderson, submitted with the petition, Mark is described as suffering from “profound” mental retardation and autism.[2] According to the physician, Mark is “nonverbal, has poor social skills,” “engages in numerous repetitive and self-stimulating behavior” and “exhibits aggressive behavior when placed in unfamiliar settings . . . including] spitting, throwing objects, and hitting his own head.” Based on the latter, the professionals recommended that Mark’s appearance at the 17-A hearing be dispensed with.
*767 Because of these, recommendations and the substantial distance Mark would be required to travel to court, the initial hearing, held September 18, 2007, involved only petitioner and the local Mental Hygiene Legal Service attorney.[3] Asked about the actions he had taken on Mark’s behalf since Marie’s death, petitioner revealed that he had never visited Mark,[4] nor had he ever contacted the authorities at Anderson to ascertain Mark’s needs. Petitioner also revealed the existence of the trust for Mark valued at almost $3 million, of which he was cotrustee with a bank. Questioned further, he admitted that not a penny of the trust’s income or principal had been spent on Mark, despite the clear intention of the trust’s grantor that it be used for Mark’s benefit.
The hearing was adjourned to permit an appearance by the corporate trustee. The court also appointed a guardian ad litem, instructed, inter alia, to investigate whether Anderson and/or Medicaid were aware of the existence of his trust.[5] The corporate trustee, a major bank, appeared at the subsequent hearing held October 6, 2008. Admitting it had done nothing to ascertain or meet Mark’s needs, the bank pleaded lack of institutional competence. Petitioner and a representative of the bank were directed either to visit Mark personally, meet with his care providers at Anderson, and ascertain needs that could be satisfied with funds from the trust, or to secure the services of a qualified professional[6] to visit, make inquiry, and provide recommendations.
*768 Thereafter the trustees engaged a certified care manager, Robin Staver Hoffman, M.S. Ed., CMC, who communicated with the staff at Anderson and, after some administrative and legal problems,[7] met with Mark in December 2008. Her first assessment is telling. Despite his diagnosis of “autism, developmental disorder, mental retardation, unspecified, and seizure disorder” and his “history” of physical aggression towards himself and others, Hoffman observed him in a classroom setting, noting that “though he is non-verbal, he appeared to respond appropriately to questions asked by classroom staff, using picture symbols and non-verbal gestures to communicate with others.” She was told that Mark “enjoys swinging and climbing outdoors” but, unfortunately, “there is no playground in the vicinity of his residence.”[8]
In her interview with Mark’s residence manager, Hoffman was informed that
“as far as [the resident manager] knew, Mark [had] not had any visitors in the five years that she had worked with him nor has he had a vacation. She stated that most of the students leave school over Christmas vacation,[9] [but] Mark remains on campus with staff. She reported that Mark would enjoy eating in a restaurant, playing music on a synthesizer, and using a computer. He could benefit from enhanced augmentative communication devices.”
In addition to these items and services that would likely improve Mark’s quality of life, Hoffman also learned of significant medical issues that could be alleviated by expenditures from the trust. Most striking of the “medical” recommendations was one relating to the antiseizure medication Mark requires. That medication, Keppra, comes in two forms. One, covered by Medicaid, which Mark was receiving, “causes adverse reactions including physical aggression, agitation, frustration and vocalization,” thus exacerbating symptoms Mark suffers as a result of his other disabilities. Keppra XR, however, an *769 extended release form of the medication, causes fewer side effects but is not covered by Medicaid. Despite being the beneficiary of a $3 million trust, Mark was limited to a medication which actually made his condition worse.[10]
The story has a relatively happy ending. Hoffman has been retained to provide ongoing care management services, the trust has released funds to pay for many of the items and services identified as likely to improve Mark’s habilitation and quality of life, and, this past summer, Mark “graduated” from his educational program. He is currently enrolled in a vocational program and continues to reside on the Anderson campus while a community placement is sought.
The story is, however, salutary as well. But for the occasion of the 17-A proceeding belatedly commenced by petitioner, Mark would, most likely, still be an entirely isolated institutional resident. Although his basic needs were met, he lacked the resources to reach his best potential and to thrive — even as significant monies left to care for him increased, unspent in his trust, from which both trustees presumably took their annual commissions.[11]
The facts in this case dramatically demonstrate why a statute that gives a guardian control over the life of a person with mental retardation and/or developmental disabilities must include provision for periodic court review.
The Need for Periodic Reporting and Review
In 1990 the Legislature mandated review of SCPA article 17-A, first enacted in 1969, in light both of the changing views of, and more sophisticated knowledge about, the populations covered by the statute, and changes in law and constitutional requirements over the intervening 20-year period (L 1990, ch 516, § 1). Although the Law Revision Commission was then in the midst of proposing massive changes to the state’s conservator and committee laws for adult guardianship, resulting in Mental Hygiene Law article 81, there was no report, no proposal, and no change to article 17-A. Twenty years later there has still been no action, but the need for reconsideration of our *770 scheme for guardianship of persons with mental retardation[12] and developmental disabilities is greater than ever.[13]
One aspect of the present law, raised by the instant case and implicating serious constitutional and international human rights issues,[14] is the absence, once a guardianship of the person is established, of any subsequent reporting or review.
Reasons for Periodic Review
Discussion of the purposes of laws requiring periodic reporting and review has thus far been confined almost entirely to so- *771 called adult guardianships.[15] In formulating recommendations for the widespread reform of such statutes that occurred in the late 1980s and early 1990s,[16] the report of the eponymous Wingspread conference[17] included a recommendation that “[a] standard annual report form should be developed and required for guardianship of the person as well as guardianship of the property” (ABA Comm on the Mentally Disabled & Comm on Legal Problems of the Elderly, Guardianship, An Agenda for Reform: Recommendations of the National Guardianship Symposium and Policy of the American Bar Association, recommendation V-B, at 23 [ABA 1989] [Wingspread recommendations]). A reporting and review requirement was subsequently *772 included in an ABA Model Guardianship Statute,[18] in the National Probate Court Standards,[19] and incorporated in New York’s adult guardianship statute, article 81.[20]
In their article on the subject,[21] Sally Balch Hurme and Erica Wood succinctly summarize the reasons for periodic review and reporting, termed “monitoring,” as follows:
“First, historically courts have had a parens patriae duty to protect those unable to care for themselves. Parens patriae is the fundamental basis for guardianship and the primary justification for curtailing civil rights. The court appoints the guardian to carry out this duty and the guardian is a fiduciary bound to the highest standards. Tn reality,’ observed one judge, ‘the court is the guardian; an individual who is given that title is merely an agent or arm of that tribunal in carrying out its sacred responsibility.’ Second, unlike with decedents’ estates, the incapacitated person is a living being whose needs may change over time. This argues for a more active court role in oversight. Third, monitoring can be good for the guardian by offering guidance and support in the undertaking of a daunting role. Fourth, monitoring can be good for the court by providing a means of tracking guardianship cases and gauging the effect of court orders. Finally, monitoring can boost the court’s image and inspire public confidence.” (Guardian Accountability Then and Now: Tracing Tenets for An Active Court Role, 31 Stetson L Rev 867, 871-872 [citations omitted].)
Arguments for monitoring have only grown stronger over the more than two decades since the Wingspread recommendations *773 and apply, as well, to persons with mental retardation. Discussing the demographic changes that militate for effective court monitoring practices, two leading commentators note that guardianship
“also serves a younger population of adults with mental retardation, developmental disabilities, and mental illnesses. Today *[i]t is estimated that there are [7] to [8] million Americans of all ages who experience mental retardation or intellectual disabilities. Intellectual disabilities affect about one in ten families in the USA.’ This number will rise with new forms of medical treatment, which will increase life spans, and an increasing number will outlive family caregivers.” (Naomi Karp and Erica F. Wood, Guardianship Monitoring: A National Survey of Court Practices, 37 Stetson L Rev 143, 150 [2007] [citations omitted].)
The great weight of commentary supports the need for, and wisdom of, a reporting and review requirement for guardians of the person, as well as those of the property.[22] If this were all, however, the remedy for the absence of such a requirement in article 17-A would rest solely with the Legislature (see e.g. Matter of John J.H., supra [holding that courts cannot read gifting power into article 17-A]). But the very changes that the Legislature noted in 1990 have, since the enactment of article 17-A, included a sea change in the constitutional protections afforded the mentally ill and mentally retarded that compels consideration of the due process requirements of guardianship appointments pursuant to that statute.
Constitutional Considerations
Subsequent to the Supreme Court’s decision in Jackson v Indiana (406 US 715 [1972]), holding that “due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed” (id. at 738), both federal and state courts have held that persons involuntarily committed to mental hospitals have a right to periodic review (see e.g. Clark v Cohen, 794 F2d 79 [3d *774 Cir 1986], affg 613 F Supp 684 [ED Pa 1985] [due process requires periodic review of continuing need for institutionalization]; accord Fasulo v Arafeh, 173 Conn 473, 378 A2d 553 [1977]). The constitutionally protected right to review has been extended to nonhospitalized mentally ill persons subject to involuntary treatment orders of unlimited duration (see e.g. In re G.K., 147 Vt 174, 514 A2d 1031 [1986]), as well as to persons whose status changed from involuntary to voluntary commitment (Matter of Buttonow, 23 NY2d 385 [1968]).
In his concurring opinion in Buttonow, Judge Keating presciently anticipated the rights of persons whose liberty was significantly impaired, but who were not actually institutionalized, writing,
“A State may not, consistent with ‘due process’, place any mentally ill person in the custody of any person or institution unless it makes some provision for periodic review of the propriety and suitability of the confinement before some impartial forum in which the incompetent is represented by a person or agency wholly committed to that person’s interest.” (Id. at 394 [emphasis added].)
Although there have been no reported cases involving guardianship, as opposed to commitment or involuntary treatment orders,[23] this state-imposed “ ‘drastic’ restraint on a person’s liberty” (Matter of M.R., 135 NJ 155, 171, 638 A2d *775 1274, 1282 [1994]) clearly triggers inquiry under Mathews v Eldridge (424 US 319 [1976]), an opinion which has been applied in cases involving the mentally retarded (e.g. Heller v Doe, 509 US 312 [1993]).[24]
*774 “The state’s parens patriae interest, exercised in guardianships or protective proceedings, should not be confused with the state’s police power . . . [although those powers] have sometimes been commingled, causing confusion and imprecision in the language of court opinions on this subject. The result is that judicial scrutiny of the exercise of the parens patriae power has been imprecise and in guardianship and conservatorship proceedings, it has historically been exercised with little or no concern for due process protections. However, the parens patriae power (the purpose of which is to protect the incompetent individual’s interests) constitutes a much less ‘important’ power from the government’s perspective than does the police power (the purpose of which is to protect society at large, as well as the individual, from actual danger). Thus, a more restrictive due process environment is justified in the exercise of the parens patriae *775 power.” (Susan G. Haines and John J. Campbell, Defects, Due Process, and Protective Proceedings: Are Our Probate Codes Unconstitutional? 14 Quinnipiac Prob LJ 57, 86 n 144 [1999].)
Due process guarantees are implicated when a protected interest is at stake. Guardianship directly infringes on liberty and property issues; as Congress noted more than two decades ago, despite the seemingly benevolent nature of the guardianship system, the consequences of guardianship are very harsh. When the court appoints a guardian, the ward loses all rights to determine anything about his life (Abuses in Guardianship of the Elderly and Infirm: A National Disgrace, supra).[25]
The consequences, and concurrent due process requirements, when the ward is a person with mental retardation or developmental disability — rather than an elderly person — are the same. As one federal court noted, “Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process” (Heryford v Parker, 396 F2d 393, 396 [10th Cir 1968]).
The provisions of Mental Hygiene Law article 81, including notice, hearing, right to counsel, proof by clear and convincing evidence, tailored guardianship, and extensive reporting and review, recognize the due process required when liberty and/or *776 property interests are at stake; our courts, similarly, have not hesitated to add additional protection where necessary to satisfy constitutional requirements (see e.g. Matter of St. Luke’s-Roosevelt Hosp. Ctr. [Marie H.], 159 Misc 2d 932 [Sup Ct, NY County 1993], mod and remanded 215 AD2d 337 [1st Dept 1995], affd after remand 226 AD2d 106 [1st Dept 1996], affd 89 NY2d 889 [1996] [holding that indigent alleged incapacitated person has the right to state paid counsel where involuntary transfer to a nursing home is requested]).
Given that due process clearly applies, the question becomes precisely, “What process is due?” a question answered by reference to Mathews' three-pronged test:
“First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.” (424 US at 335.)
These three prongs and their applicability to article 17-A will be considered seriatim.
(a) The Private Interest
The appointment of a plenary guardian of the person under article 17-A gives that guardian virtually total power over her ward’s life (see Matter of Chaim A.K., supra), including virtually all medical decisions, where the ward shall live, with whom she may associate, when and if she may travel, whether she may work or be enrolled in habilitation programs, etc. This imposition of virtually complete power over the ward clearly and dramatically infringes on a ward’s liberty interests.
As the Supreme Court recognized almost a century ago, the liberty protected by the constitution encompasses
“not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children . . . and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men” (Meyer v Nebraska, 262 US 390, 399 [1923]; see also Bolling v Sharpe, 347 US 497 [1954] [Al *777 though the Court has not assumed to define “liberty” with any great precision, the term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective (id. at 499-500)]).
Appointment of a guardian of the property divests the ward of any control over that property and apparently deprives the ward of the right to contract,[26] implicating protected property interests.
(b) The Risk of an Erroneous Deprivation of Such Interests through Procedures Used and the Probable Value, If Any, of Additional or Substitute Procedural Safeguards
It is common for parents of children with mental retardation and/or developmental disability to apply for 17-A guardianship at the time their children reach their majority. The guardianship is granted on a dual finding that the person is in need of a guardian and that it is in the person’s best interest that the particular person (or persons, in the case of coguardians) be appointed her guardian. Under the present statutory scheme, that is the end of the court’s involvement; the guardianship may continue for decades and, unless the guardian becomes unable to act and someone else petitions for guardianship,[27] the court will never again have an opportunity to ascertain either the ward’s continuing need, or whether her best interests are being served.
With a periodic reporting and review requirement, however, the court can ascertain whether the deprivation of liberty resulting from guardianship is still justified by the ward’s disabilities, or whether she has progressed to a level where she can live and *778 function on her own.[28] Given the services and educational opportunities available to the target population, and the wide spectrum of disability/capacity among persons with mental retardation and developmental disability (see e.g. Chaim A.K., supra; Heller v Doe, 509 US at 322), this is not purely speculative but a real possibility which, without periodic reporting and review, could leave functioning, capacitated adults with guardians whose powers constitute a “massive curtailment of liberty” (In re Guardianship of Deere, 708 P2d 1123, 1125 [Okla 1985]).[29]
Much more likely, but equally serious, is the possibility that a guardian is no longer acting in the ward’s best interests. The guardian may have removed the ward from a program providing habilitation services for her own convenience but to the ward’s detriment. She may fail to attend to the ward’s physical health needs. She may have confined the ward to a single room, without outside stimulation, for years, causing the ward to “lose” the skills and capacities she learned while still in the educational system. She may fail to provide for the ward properly because she lacks knowledge of how to do so, often because of language limitations, or she may herself have become disabled, or partially disabled.[30]
*779 The instant case provides a poignant set of examples of the potential risks attendant to the existing system. Without the procedural requirement of periodic reporting and review, Mark could be moved from Anderson to a setting in which his autonomy is not maximized, solely for administrative convenience, despite the availability of funds to maximize his well-being.[31] Similarly, he could be deprived of optimal medical care because, without attention, he is limited to what Medicaid provides. The very situation that has occurred for the past four years could continue indefinitely despite funds to provide a variety of capacity enhancing items (like computers) and services (like consultation with non-Medicaid physicians), as well as to improve significantly the quality of his life.
Thus, in the absence of periodic reporting and review, the risk of deprivation of protected liberty interests is great, while imposing a yearly reporting requirement on 17-A guardians of the person would substantially increase the likelihood that guardianship is still needed and/or in the best interests of the ward, and the very reason for burdening her liberty interests is being served.
There is one final argument for requiring guardians to report on a periodic basis. In the absence of such reporting, there is virtually no other way for the court to stay apprised of the ward’s situation,[32] since the ward herself may well lack capacity to engage the court.[33] As the Ninth Circuit has written in the context of involuntarily committed mental patients, “No matter how elaborate and accurate the . . . proceedings available . . . may be once undertaken, their protection is illusory when a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place” (Doe v Gallinot, 657 F2d 1017, 1023 [9th Cir 1981]). And, as *780 one commentator has noted, “[pjeriodic judicial review ensures that a mentally retarded person is treated as an individual by requiring the state to rejustify [the continued curtailment of her liberty]” (William Christian, Note, Normalization as a Goal: The Americans with Disabilities Act and Individuals with Mental Retardation, 73 Tex L Rev 409, 438 [1994]).
(c) The Government’s Interest, Including the Function Involved and the Fiscal and Administrative Burdens That the Additional Procedural Requirements Will Entail
The policy of the State, enunciated by the Legislature, is “the promotion and attainment of independence, inclusion, individuality and productivity for persons with mental retardation and developmental disabilities” (Mental Hygiene Law § 13.01). The Office of Mental Retardation and Developmental Disabilities is charged with carrying out this policy, including ensuring that the “personal and civil rights [of the persons it serves] are protected” (Mental Hygiene Law § 13.07 [c]). New York has thus recognized both maximization of autonomy and protection of rights as among the fundamental responsibilities of the State to persons with mental retardation and developmental disabilities. This basic policy infuses the “government’s interest” in guardianship proceedings for Mathews v Eldridge purposes.
The governmental interest is, thus, nothing less than ensuring that when, in the exercise of its parens patriae power, it places almost total control over a person with disabilities in the hands of another, that person is, at the very least, no worse off than she would have been had no guardianship been imposed. To accomplish this it is necessary to create and maintain a periodic monitoring system in which guardians of the person report yearly on the condition of their wards and any changes that may have occurred. The court, in turn, must provide for review of those reports, and be prepared to take action if necessary to protect the ward and/or to ensure her well-being.
This function is not unknown to Surrogate’s Court.[34] Article 17-A provides for yearly reports by 17-A guardians of the property (SCPA 1761), and article 17, which deals with property guardianships for minors without mental retardation or developmental disability, also requires yearly accountings (SCPA *781 1719). In this court, a clerk has been trained to review those accountings, and does so promptly and thoroughly. When reports are not filed timely, the court makes inquiry and takes action to obtain the mandated account(s); if unsuccessful, a guardian ad litem may be appointed for the ward, or the court may suspend or sanction the guardian on its own motion.
Although the substance of personal needs monitoring is different from financial accounting, the process is familiar, and the court’s computer system is already set up to note due dates and to generate reminders and/or warnings for property guardians. Court personnel charged with monitoring the reports of guardians of the person may require some modest additional training, but almost certainly the major service providers for the mental retardation and developmental disability communities[35] will make such training available if requested.
Another question requiring attention, in the absence of legislative guidance,[36] is the form such monitoring should take. Most wards in New York City are already connected to services and to periodic contact and review, often through a Medicaid coordinator.[37] Substantial changes in physical and mental condition, or the existence of endangering conditions, are thus already likely to come to the attention of authority. This de facto oversight is not, however, available for all wards with guardians appointed by this court and, of course, even where available, it varies in quality and is subject to budget constraints.
The population of guardians, as well as of their wards, must also be considered. Mental retardation and developmental disability are not related to race, ethnicity, or socioeconomic status, *782 although the latter may affect the range of services available because of access to paid private services, as in the instant case. It is also fair to say that many more persons of lower socioeconomic status seek 17-A guardianship than article 81 guardianship,[38] and many, as well, either do not speak English as a first language or do not speak English at all.[39] Any monitoring system must take these facts, as well as the lack of formal education of many guardians, into account.
In order to meet the court’s due process obligations to its wards within its own fiscal and personnel constraints, and in light of the diverse population of guardians and wards involved, there should be a relatively simple questionnaire,[40] sent to guardians on the yearly anniversary of their appointment. Although this proactive practice causes a somewhat greater burden for the court than placing the obligation to report on the guardian, as is the case under article 81, computer-generated questionnaires minimize the additional effort, while recognizing the differing capacities of 17-A guardians. And, although there are no outside court examiners to review the responses,[41] it is possible, if not optimal, to redeploy existing court personnel to accomplish this additional function.[42]
In appropriate cases, as here, the appointing order of the court may require the guardian to provide more, and more nu *783 anced, information to ensure that the resources available to the ward are utilized to maximize his habilitation and the quality of his life.[43] It is also possible that, going forward, the court may be able to develop more innovative — and less costly — ways of fulfilling its monitoring obligation, whether through a pro bono[44] or volunteer program[45] or otherwise.
The Applicability of International Human Rights Norms
In addition to the more familiar liberty and property rights protection offered by the Fourteenth Amendment, international human rights norms derived from treaties signed and ratified by the United States have relevance to the instant case and, more broadly, the situation of persons with intellectual disabilities, by virtue of the Supremacy Clause (see United States v Pink, 315 US 203, 230 [1942]).
In 2006 the United Nations General Assembly adopted the Convention and Optional Protocol on the Rights of Persons with Disabilities, opened for signature December 13, 2006 (46 ILM 443 [2007] [the Disability Convention]). According to a handbook for parliamentarians drafted by the Office of the United Nations High Commissioner for Human Rights, the purpose of the Disability Convention is to “reaffirm the dignity and worth of every person with a disability, and to provide States with an effective legal tool to end the injustice, discrimination, and violation of rights that confront most persons with disabilities” {From Exclusion to Equality: Realizing the Rights of Persons with Disabilities: The Compelling Reasons, http:// www.un.org/disabilities/default.asp?id=215 [accessed Oct. 3, 2009]). The United States became a signatory on July 24, 2009 (74 Fed Reg 37923 [July 24, 2009]).[46]
Article 12 of the Disability Convention protects a disabled person’s rights to “[e]qual recognition before the law,” with the *784 goal of affirming that persons with disabilities have the right to recognition everywhere as persons before the law, and that they enjoy legal capacity on an equal basis with others in all aspects of life. States may act in order to support disabled individuals who are exercising their legal capacities (46 ILM at 450); other articles provide a plethora of rights to persons with disabilities that implicate 17-A guardianships.[47]
To the extent that article 12 recognizes the state’s power to act to support disabled individuals, it requires that signatories
“shall ensure that all measures that relate to the exercise of legal capacity provide for appropriate and effective safeguards to prevent abuse . . . Such safeguards shall ensure that measures relating to the exercise of legal capacity respect the rights, will and preferences of the person, are free of conflict of interest and undue influence, are proportional and tailored to the person’s circumstances[48] apply for the shortest time possible and are subject to regular review by a competent, independent and impartial authority or judicial body” (Art 12 [4], id. at 450 [emphasis added].)
Thus, as a matter of international human rights law, state interventions, like guardianships, pursuant to parens patriae power, must be subject to periodic review to prevent the abuses *785 which may otherwise flow from the state’s grant of power over a person with disabilities such as those covered by SCPA article 17-A. Because the Disability Convention has not yet been ratified by the Senate, a state’s obligations under it are controlled by the Vienna Convention on the Law of Treaties, adopted May 22, 1969 (1155 UNTS 331, 8 ILM 679 [Vienna Convention]),[49] which requires signatories “to refrain from acts which would defeat [the Disability Convention’s] object and purpose” (art 18, 8 ILM at 686). Arguably, granting guardianships (especially plenary guardianships) over persons with mental retardation and developmental disability with absolutely no review provisions defeats the “object[s] and purpose” of a convention intended to protect against the “injustice . . . and violation of rights” confronting persons with intellectual disabilities. In any case, courts and the Legislature should be aware that, if and when the Disability Convention is ratified, the State’s obligations with regard to the various rights guaranteed by the Convention will be affirmative (“A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty” [Vienna Convention art 27, 8 ILM at 690]), and current article 17-A will be problematic at best.
It should also be noted that the United States has long since ratified the International Covenant on Civil and Political Rights, opened for signature December 19, 1966 (999 UNTS 171, 1966 UST LEXIS 521 [ICCPR]).[50] While the ICCPR nowhere deals explicitly with persons with intellectual disabilities, it provides for “the right of self-determination” (art 1 [1], 1966 UST LEXIS 521, *96); “liberty of movement,” including “[the right] to choose [one’s own] residence” (art 12 [1], id. at *104);[51] freedom from “arbitrary or unlawful interference with . . . privacy” (art 17 [1], id. at *108); and “freedom of association with others” (art 22 [1], id. at *111). Similarly, although there is no specific *786 requirement of periodic review when the State exercises its parens patriae power, the ICCPR requires signatories “to take the necessary steps ... to adopt such . . . measures as may be necessary to give effect to the rights recognized” by the ICCPR (art 2 [2], id. at *98). It is difficult to see how the State can meet that obligation in the case of 17-A guardianships without some provision for monitoring the guardians appointed by the State, and the wards it has undertaken to protect.
Finally, whatever the treaty obligations already assumed, or likely to be assumed if and when the Disability Convention is ratified, international adoption of protection of the rights of persons with intellectual and other disabilities, including the right to periodic review of burdens on individual liberty, is entitled to “persuasive weight” in interpreting our own laws and constitutional protections (see e.g. Lawrence v Texas, 539 US 558, 576 [2003]; Grutter v Bollinger, 539 US 306, 344 [2003, Ginsburg, J., concurring, joined by Breyer, J.] [“The Court’s observation that race-conscious programs must have a logical end point . . . accords with the international understanding of the office of affirmative action. The (treaty on point), ratified by the United States in 1994, . . . endorses special and concrete measures to ensure the adequate development and protection of certain racial groups or individuals belonging to them, for the purpose of guaranteeing them the full and equal enjoyment of human rights and fundamental freedoms” (citations and internal quotation marks omitted)]); it further supports the conclusion that any guardianship statutes, including article 17-A, must contain provisions for periodic review or be found constitutionally wanting.
Conclusion
As a matter of fundamental due process, the State may not impose the “extensive loss of personal liberty [inherent] in the guardianship process” (Norman Fell, Guardianship and the Elderly: Oversight Not Overlooked, 25 U Tol L Rev 189, 190 [1994]) without some guarantee that the person or persons to whom it has granted guardianship of the person continues to act in her ward’s best interests, and that the ward is, at the very least, no worse off than before the guardianship was awarded.
Utilizing the “what process is due” analysis of Mathews v Eldridge (424 US at 333, 349), it is clear that a court granting guardianship of the mentally retarded and developmentally disabled must require periodic reporting and review — or “monitor *787 ing” — by 17-A guardians of the person, even as it does, by statute, of 17-A guardians of the property. This monitoring requirement is inherent not only in the Fourteenth Amendment guarantee of due process of law, but also under the international human rights norms contained in the Disability Convention and the ICCPR.
Where, as here, a statute would be unconstitutional in the absence of a particular required procedure, the courts of our state have not hesitated to “read in” those procedures (see e.g. Matter of Buttonow, supra, 23 NY2d 385, 393 [1968] [“we preserve the constitutionality of the statute” by reading into the Mental Hygiene Law “a requirement (1) that a mentally ill patient, converted from involuntary to voluntary status, be accorded a (judicial hearing on status and retention) and (2) that he be afforded the same sort of assistance from the (Mental Hygiene Legal Service)”]). Going forward, therefore, article 17-A should be read to include a requirement of yearly reporting (whether in response to a questionnaire from the court, or through the guardian’s obligation to file a report, as contained in the letters of guardianship) and of review by the court as described in the Mathews discussion supra.[52]
In the instant case, the court finds, based on the evidence before it, that Mark is a person with developmental disabilities of such magnitude that he is in need of a guardian of the person;[53] that, in the absence of any other candidate, it is in Mark’s best interest that petitioner be appointed his guardian;[54] and that the guardian shall report to this court, on a yearly basis, providing such information as is required by Mental Hygiene Law § 81.31 for persons adjudicated incapacitated and appointed guardians under article 81.

. Petitioner was Marie’s attorney, who drafted both her will and the two trusts. He brought the guardianship proceeding as the result of what he described as a “death bed promise” he made to Marie.

. The affirmation of the Mental Hygiene Legal Service (MHLS) attorney who visited Mark at Anderson and who reviewed his chart there notes diagnoses of mental retardation, autism and macrocephaly. Testing in 2007 indicates that “he has the receptive communication skills of someone less than two years old and the expressive skills of a three-month old.” The attorney confirmed that “effective communication was not possible” and reiterated Mark’s residence manager’s belief that he “would not cooperate” for transport to a court hearing in Manhattan and that he would “display aggressive behavior if placed in an unfamiliar courthouse setting.”

. MHLS is a party to the 17-A proceedings when the proposed ward is a resident in an institutional setting. (SCPA 1753 [2] [b].) Rather than have the attorney who visited Mark at Anderson travel to New York City, MHLS was represented by an attorney from its staff in the First Department.

. The MHLS attorney confirmed that examination of Mark’s records showed he had not had a single visitor since before his mother’s death.

. Neither had been told of the trust’s existence, but because its terms complied with applicable rules, Mark was subsequently recertified for Medicaid.

. A “cottage industry” has grown up around the need for professional care supervision for older persons, especially persons with mental and physical disabilities. Social workers and other health care professionals are certified as geriatric care managers and may be contacted through their professional organization, the National Association of Professional Geriatric Care Managers. While there does not yet appear to be similar organizational growth in support of the mentally retarded and developmentally disabled, there is significant crossover; indeed, the care manager retained for Mark had previously been a case worker at YAI (Young Adult Institute), one of the major organizations serving the developmentally disabled in New York City.

. Because of privacy concerns under federal law, petitioner had to be given letters of temporary guardianship in order to authorize Hoffman’s access to Mark’s records and to Mark personally.

. Prior to her visit, Anderson personnel communicated this issue to Hoffman and submitted a proposal for a play structure with swings to petitioner. No action, however, had been taken.

9. Mark’s caregivers recommended a “1 week vacation to Disney World with 2 staff members on duty 24 hours per day.”

. Among other “medical” recommendations was a request for a “neurology consultation with a non-Medicaid neurologist” and “Keppra XR and other medications and medical services not covered by Medicaid.”

. As discussed below, the court has, sua sponte, ordered an accounting of the trust and of Marie H.’s estate to determine whether there are additional funds that might be added or returned to the trust and made available for Mark’s needs.

. An initial reconsideration might involve the terminology employed. A recent contretemps about a public figure’s use of the term “retard” demonstrates the continuing derogatory implication carried by the term “mental retardation.” Advocacy groups have responded to the notion that “[s]ociety’s labels have consequences” by changing their names (for example, from the American Association on Mental Retardation to the American Association on Intellectual and Developmental Disabilities [AAIDD]) and the definitions in the most respected resource on what are now denominated “people with intellectual disabilities.” {See AAIDD, New Professional Resource Establishes Ground-breaking Paradigm To Support People with Intellectual Disabilities, Sept. 14, 2009, available at http://www.aamr.org/ intellectualdisabilitybook/content_2351.cfm?nav ID=270 [last accessed Mar. 12, 2010] [noting publication of the 11th edition of the basic resource utilized by professionals working with what were previously called the mentally retarded and developmentally disabled].)
Recent legislation, both federal and state, has sought to replace the term “mental retardation” with the “respectful language” of “intellectually disabled” or “persons with intellectual disabilities.” (See e.g. What’s in a name? Legislation would end use of the term ‘mental retardation’, Los Angeles Times, Nov. 19, 2009, available at http://latimesblogs.latimes.com/booster_shots/2009/ 11/whats-in-a-name-legislation-would-end-use-of-the-term-mental-retardation.html [accessed Mar. 18, 2010] [describing legislation introduced in the U.S. Senate by Senator Barbara Mikulski to outlaw the use of the term in federal statutes and policy papers]; 2009-2010 Washington House Bill HB 2490, enacted as L 2010, ch 94, available at http://apps.leg.wa.gov/billinfo/ summary.aspx?bill=2490 [respectful language bill adopted in Washington state] [eff June 10, 2010]; Maine Developmental Disabilities Council, Report of the Respectful Language Workgroup, available at http://www.maineddc.org/ respectful-language.html [Mar. 6, 2008] [recommendations from working group constituted by Maine Legislature].)

. In addition to the requirements of due process, discussed below, there is a need to clarify the powers of a guardian. See this court’s opinions in Matter of John J.H. (27 Misc 3d 705 [2010] [holding that 17-A guardian lacks power to make gifts from property of the ward]) and Matter of Chaim A.K. (26 Misc 3d 837 [2009] [discussing need for limited, tailored guardianships]). But see Matter of Yvette A. (27 Misc 3d 945 [2010, Webber, J.] [finding power to tailor in SCPA 1755]).

. As discussed infra, this issue also implicates the recently enacted United Nations Convention and Optional Protocol on the Rights of Persons With Disabilities, opened for signatures December 13, 2006 (46 ILM 443 [2007]).

. The distinction between guardianships under article 17-A and so-called “adult guardianship” under article 81 is a misnomer, since article 17-A is often utilized where the proposed ward is an adult, and article 81 has been employed for infants. Its roots he in English common law where there was a distinction in the sovereign’s powers over, and responsibility to, “idiots” (the mentally retarded who were born with disability) and “lunatics” (persons with mental illness). (1 E Pollock and F. Maitland, The History of English Law, at 481 [2d ed 1909], as cited and discussed in Heller v Doe, 509 US 312, 326-328 [1993].) The practical distinction, however, is that “adult guardianship” generally applies to a person who has had, and then lost, capacity, while article 17-A was intended to apply to persons who never had capacity, such that the authority their parents had over them as minors needs to be continued indefinitely in their legal adulthood.
Indeed, New York appears to be one of the few states in the nation that has separate guardianship statutes for each of these populations; the other states to distinguish are California, Connecticut, Idaho, Kentucky, and Michigan. All of these states require the guardian of a person with developmental disabilities to report to the court on a regular basis to ensure that the need for a guardian still exists. States with yearly reporting requirements are Idaho (Idaho Code Ann § 66-405 [6]), Kentucky (Ky Rev Stat Ann § 387.670), and Michigan (Mich Comp Laws § 330.1631 [2]). California requires guardians to report one year after the appointment and biennially thereafter (Cal Prob Code § 1850.5). Connecticut courts require guardians to report every three years (Conn Gen Stat § 45a-681).

. The national movement for guardianship reform resulted from an Associated Press series that detailed massive abuses by adult guardians in states across the country. (See Guardians of the Elderly: An Ailing System, AP Special Report [Sept. 1987] in Abuses in Guardianship of the Elderly and Infirm: A National Disgrace, a Report by the Chairman of the Subcommittee on Health and Long-Term Care of the Select Committee on Aging of the House of Representatives, 100th Cong, 1st Sess, HR Comm Print 100-639, at 13-57 [Dec. 1987].)

. The AP report triggered an interdisciplinary conference held at a center in Wingspread, Wisconsin, convened by, inter alia, the ABA’s Commission on Legal Problems of the Elderly. The recommendations from that conference were subsequently adopted by the ABA House of Delegates. (See Sally Balch Hurme and Erica Wood, Guardian Accountability Then and Now: Tracing Tenets for an Active Court Role, 31 Stetson L Rev 867, 868 [2002].)

. Model Guardianship and Conservatorship Statute § 17 (b); § 18 (7), cited in Hurme and Wood at 898 n 216 (recommending that the guardian of the person inform the court of changes relating to the guardianship).

. Commission on National Probate Court Standards, National Probate Court Standards, standard 3.3.14, Commentary at 72 (Natl Ctr for State Cts 1993) (reflecting “judges’ need to receive annual reports on the ward’s condition” which “enables the court ‘to determine whether the guardian is appropriately carrying out the guardian’s assigned duties and responsibilities’ ” [Hurme and Wood at 899]).

. That statute requires the guardian to report 90 days after appointment, and thereafter on a yearly basis. A guardian of the person must include in her report current information about the ward’s living situation, health, medical condition and medications taken, and rehabilitative services provided. (Mental Hygiene Law § 81.30 [a]; § 81.31 [a], [b].)

. See n 17.

. Significantly, article 17-A has always required yearly reports by property guardians for the mentally retarded and/or developmentally disabled. The content of such reporting is only broadly described, and there are variations in what is required among the various Surrogate’s Courts. By contrast, article 81 sets out specific requirements for all property guardians appointed pursuant to that statute. (See Mental Hygiene Law § 81.30 [b] [90-day report]; § 81.31 [a], [b] [7] [yearly report].)

. One reason for this may be the focus of civil rights litigators on involuntary commitment issues of the mentally ill in the 1970s and 1980s, while the emphasis of the lesser volume of litigation on behalf of persons with mental retardation was to obtain a “right to treatment.” (See e.g. David J. Rothman and Sheila M. Rothman, The Willowbrook Wars: Bringing the Mentally Disabled into the Community [2d ed 2005].) Two thoughtful commentators offer another analysis:

. It is indisputable that, “although guardianship is generated from the standpoint of benevolence, it nonetheless results in a dramatic and substantial loss of personal autonomy, self-determination and civil liberty.” (Norman Fell, Guardianship and the Elderly: Oversight Not Overlooked, 25 U Tol L Rev 189, 190 [1994].) In Heller, the Supreme Court considered an equal protection challenge to a Kentucky statute that, inter alia, required different burdens of proof for commitment of the mentally retarded (clear and convincing evidence) and the mentally ill (beyond a reasonable doubt). Notably, Kentucky’s burden of proof for involuntary commitment of the mentally retarded is the same as New York’s for guardianship of incapacitated adults. The Court also held the Mathews test applicable to the single due process claim made there, upholding the statute but leaving open other potential procedural due process challenges.

. While the majority of cases, literature and commentary are directed at adult guardianships rather than those of the mentally retarded and developmentally disabled, the interests implicated are the same. Like persons suffering from mental illness, courts “must recognize the dignity and worth of such a person” with mental retardation or developmental disabilities. (Superintendent of Belchertown State School v Saikewicz, 373 Mass 728, 746, 370 NE2d 417, 428 [1977].)

. The single exception, permitting a limited guardian of the property, exists when the ward is self-supporting as a result of his wages. Under those circumstances, and only those circumstances, the ward is permitted to retain his wages and contract in an amount equal to a month’s wages, or $300, whichever is greater. (SCPA 1756.)

. The statute provides for nomination of a standby guardian who assumes all the legal powers of the guardian upon the latter’s inability to act. (SCPA 1757.) The authority of the standby guardian lasts for 180 days, and she or someone else must petition the court for a new guardianship or the existing guardianship terminates, leaving the ward with no guardian. It is this court’s experience that guardianships have often lapsed under these circumstances, with petitions by the former standby guardian or another person only years, and sometimes decades, later, brought generally because of the need for the ward’s hospitalization or some other major medical decision.

. In four years, this court has seen two such cases, one of which came to the court’s attention because the guardian was also guardian of the property; her failure to file the required annual reports led to inquiry and discovery that the ward was living independently, working, and supporting herself and her new family. That guardianship was happily terminated (see Matter of Keisha L. McLean, file No. 1993-1963), as was another in which the ward himself petitioned to remove a guardian who had not seen, or communicated with the ward, for years (Matter of Frederick Charles Smith, file No. 2001-1776).

. This situation is exacerbated by the failure of article 17-A to provide for anything other than a plenary guardianship. As one commentator, who is also a practitioner, notes
“Developmentally disabled individuals . . . are not, and should not, be viewed or treated as ‘eternal children.’ A delicate balance must be struck between respecting the developmentally disabled individual’s adult status, and the implicit legal rights granted by that status, with the parents’ interest and understandable desire to continue to protect and assist their developmentally disabled child. Such a balance is found in limited [guardianships], which provide a protective proceeding that is uniquely tailored and specifically applied to the developmentally disabled individual in the least restrictive manner possible.” (Melinda Hunsaker, Limited Conservatorships: A Delicate Balance, 50 Orange County Law [Nov. 2008] 26, 26.)

. In the past four years, this court has, sadly, become aware of each of these scenarios involving the caretakers of persons with mental retardation or developmental disability.

. In fact, Mark having “aged out” of the educational system which allowed him to reside at Anderson as a “student,” the care manager is actively working with the staff at Anderson to find the best possible placement that will allow Mark to continue vocational training and habilitation.

. For a discussion of the danger that an intellectually disabled person whose liberty has been removed by a court may get “lost” in the system, see, e.g., James W. Ellis, Decisions By and For People with Mental Retardation: Balancing Considerations of Autonomy and Protection (37 Vill L Rev 1779, 1809 n 124 [1992]).

. Although article 17-A provides for a proceeding by which a guardianship may be terminated (SCPA 1759), commencing such a proceeding is unquestionably daunting, and may be impossible for someone who is immobile or illiterate. Of equal concern, there is no proceeding by which changes in the ward’s condition or situation can be addressed.

. Nor is it unknown to courts with jurisdiction over persons with mental retardation and developmental disabilities in other states. (See e.g. Mich Comp Laws § 330.1631 [2] [requiring plenary or partial guardian to report “not less often than annually” on a wide variety of information about the ward].)

. In New York City, these are the Association for the Help of Retarded Children (AHRC) and, for those with developmental disabilities, the Young Adult Institute.

. In enacting article 81, the Legislature provided an extensive and detailed monitoring system, including court-appointed “Court Examiners” who review the yearly reports and, in turn, report to the court. The court examiners are paid a fee from the ward’s estate, calculated by reference to the size of the estate.

. Medicaid pays for a variety of services for persons with mental retardation and developmental disabilities, including habilitation programs, transportation and, where necessary, home health aides or residential placement. Until a ward reaches 21 years of age, she is also served by the public education system, whether in the public schools or more specialized educational settings. After-school and weekend programs are also available. New York is to be commended for the wide range of services it provides to enable this population to reach their highest potentials and to lead the best lives possible.

. There are many reasons for this, including the encouragement and assistance parents receive from the agencies with which they are connected, or the schools where their children are enrolled at the time those children approach their majority and “age out” of the education system.

. Frequently in such situation, other children in the family are English speakers and assist their parents in navigating an official world that is mostly monolingual. AHRC and YAI also provide translation assistance, as do the limited pro bono programs that aid parents in obtaining 17-A guardianships of their children.

. Information requested will not differ substantially from that which guardians are required to provide in their initial petitions, and should include where and with whom the ward resides, services the ward is receiving, including any additions or deletions since the previous report, medications taken, the name and contact information of the Medicaid coordinator or social worker, if any, and any other significant changes in the ward’s condition and/or situation.

. It is also unlikely that an independent court examiner system would be workable for review of the reports of 17-A guardians of the person, since most wards have no funds from which a court evaluator could be paid.

. No funds or additional personnel were provided at the time that yearly reports for guardians of the property were required. Although “unfunded mandates” place increasing and ultimately unsustainable burden on courts, this additional monitoring requirement should not have so draconian a consequence on the Surrogate’s Court.

. Petitioner here will be required to provide, on a yearly basis, a report that meets the requirements of Mental Hygiene Law § 81.31, which, because he is both an attorney and the trustee of the trust for Mark’s benefit, should not be unduly burdensome.

. The current system of appointing guardians ad litem in 17-A proceedings is, for all intents and purposes, a pro bono program, and could benefit from being explicitly denominated as such, with appropriate training and credit for the attorneys who participate.

. In the area of adult guardianships, where there is no paid court examiner system, there have been successful programs utilizing trained volunteers, most notably those developed by AARE {See Hurme and Wood, 31 Stetson L Rev at 908.)

. In his signing statement, President Obama noted,
*784 “Disability rights aren’t just civil rights to be enforced here at home; they’re universal rights to be recognized and promoted around the world . . .
“This extraordinary treaty . . . reaffirms the inherent dignity and worth and independence of all persons worldwide. I’ve instructed Ambassador Susan Rice to formally sign the Convention . . . and I hope the Senate can give swift consideration and approval to the Convention once I submit it for their advice and consent.” (See Remarks by the President on Signing of U.N. Convention of the Rights of Persons with Disabilities Proclamation, http://www.whitehouse.gov/the_press_office/Remarks-bythe-President-on-Rights-of-Persons-with-Disabilities-Proclamation-Signing [accessed Apr. 14, 2010].)

. These include article 22’s guarantee of an individual’s right to privacy (id. at 453), the right to live independently and to choose one’s place of residence and with whom one lives, contained in article 19 (id. at 452), article 16’s guarantee of “[f]reedom from exploitation, violence and abuse” (id. at 451-452) and article 15’s right to “[fjreedom from torture or cruel, inhuman or degrading treatment or punishment” (id. at 451). Unsupervised, unreviewed guardianships of persons with mental retardation and developmental disability may, sadly, result in violations of any or all of these protected rights.

48. The requirement of proportionality and tailoring, incorporated in article 81, is entirely lacking in article 17-A. (See Chaim A.K., supra-, see contra Matter of Yvette A., 27 Misc 3d 945 [2010].)

. Although the United States has signed but not ratified the Vienna Convention, the State Department accepts the Convention “as an authoritative guide to customary international law [and as] comport[ing] with the general principles that govern customary international law” and, as such, it is “binding even for countries which have never, and do not, become parties to the Convention.” (Evan Griddle, The Vienna Convention on the Law of Treaties in U.S. Treaty Interpretation, 44 Va J Intl L 431, 444 [2004] [citations omitted].)

. The full text of the ICCPR can be found at the Web site of the Office of the United Nations High Commissioner for Human Rights (http:// www2.ohchr.org/englishAaw/ccpr.htm [accessed Apr. 21, 2010]).

. This was one of the rights, albeit not derived from the ICCPR, that figured in Matter of M.R. (135 NJ 155, 638 A2d 1274 [1994], supra).

. Effective as of the date of this decision, all new personal guardianships in Surrogate’s Court, New York County shall be subject to a reporting requirement that guardians answer a yearly questionnaire to be generated by the court, unless the appointing order requires additional information, which shall be supplied in accordance with that order.

. Although the petition initially also requested guardianship of the property, that relief was stricken because petitioner already controls all funds due Mark as cotrustee of his trust.

. The court also finds that Mark is incapable of understanding end-of-life decision making, or of giving consent to maintenance or withdrawal of extraordinary measures for preserving life, and so grants petitioner end-of-life decision-making power in accordance with SCPA 1750-b.